**Stanley L. LARSON, Petitioner,**

v.

**DEPARTMENT OF THE ARMY, Respondent.**

No. 00–3041.

United States Court of Appeals, Federal Circuit.

Aug. 14, 2001.

Loren M. Lambert, of Salt Lake City, Utah, argued for petitioner.

Patricia M. McCarthy, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were David M. Cohen, Director, and Mark A. Melnick, Assistant Director. Of counsel on the brief was Louis D. Carlson, Attorney/Advisor, Office of the Command Judge Advocate, U.S. Army Dugway Proving Ground, of Dugway, Utah.

Before NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, and LINN, Circuit Judge.

ARCHER, Senior Circuit Judge.

Stanley Larson petitions for review of the final decision of the Merit Systems Protection Board ("Board") denying his request for corrective action under the Whistleblower Protection Act of 1989, Pub.L. No. 101–12, 103 Stat. 16 (1989) (codified in scattered sections of 5 U.S.C.). *Larson v. Dep't of the Army,* 83 M.S.P.R. 594 (M.S.P.B. 1999). Because the Board's decision is based on an incomplete and inaccurate review of the record, we vacate and remand.

## BACKGROUND

Larson is a motor vehicle operator (warehouse worker) at the U.S. Army Dugway Proving Ground in Dugway, Utah. Larson is responsible for transporting and properly storing a variety of materials, including high explosives and munitions. He ensures that the stored materials are properly marked, that they are stored only with compatible materials, and that explosive limits are not exceeded for a particular storage location. He is also responsible for periodic inventories of stored materials.

In late October 1997, an inspection revealed a loose light fixture in an ammunition storage facility, known as an "igloo." An electrician examined the fixture and determined that power tools would be required to fix it. Larson, who was present during this inspection, informed the electrician that power tools could not be used in an igloo filled with explosives. Larson informed the electrician that he would ask his supervisor, Mr. Diel, how they should proceed. Larson discussed the issue with Diel and suggested that the explosives be removed from the igloo so that the fixture could be repaired. Diel disagreed and de-

cided to remove the defective lighting fixture, rather than repairing it, without removing the ammunition.

Larson objected to this decision. He felt that removing the light fixture was wasteful. Larson was also concerned that changing the lighting system (removing it) without first removing all ammunition from the igloo would violate the relevant safety regulations. Larson therefore contacted the Dugway Proving Grounds Safety Office and relayed his concerns to Trace Salmon, a safety specialist in that office. Salmon indicated that Larson's concern seemed reasonable and agreed to investigate the pertinent regulatory requirements. Salmon subsequently consulted with Craig Bodily, a safety and occupational health specialist in the Safety Office. Bodily was to research the issue and to call Larson with his results. Bodily determined that some maintenance activities could take place in the presence of explosives and others could not. He called Larson and informed him of his findings, but the record does not indicate whether he made any specific recommendation concerning the maintenance activity at issue—removal of the light fixture.

On November 5, 1997, an electrician called Larson to inform him that he would be arriving shortly to remove the light fixture, pursuant to Diel's orders. Still concerned that the removal of the light fixture was a safety violation, Larson again contacted the Safety Office. This time he spoke to a third individual, Clair McBride. McBride listened to Larson's concerns and informed him that he would investigate the matter and get back to him. McBride subsequently contacted the electricians who were to perform the work on the igloo as well as the electricians' supervisor. He also contacted Diel and Walt Vigil, a quality assurance ammunition specialist. McBride additionally consulted the relevant safety regulations. Following this in-

vestigation, McBride determined that the removal of the light fixture did not require removing the ammunition from the igloo, and McBride informed Diel and Larson of this determination. It is unclear from the record, however, when McBride communicated his conclusions to Diel and Larson.

Meanwhile, later in the morning of that same day, November 5, the electricians arrived and Diel asked Larson to retrieve the key to the igloo so that they could perform the scheduled work. Larson refused, telling Diel that if he wanted the key he would have to get it himself. Diel then asked Larson if he knew what insubordination was, and Larson replied that he did. The next day, Diel proposed a 3–day suspension for Larson. This suspension was later reduced to one day.

Approximately two weeks later, on November 18, 1997, Larson received his performance appraisal for the rating period of April 6, 1996 to March 31, 1997 ("the 1996–7 appraisal"). This appraisal, which did not cover the time period of Larson's alleged act of insubordination, rated his performance at the intermediate "success" level. Larson had previously complained on numerous occasions that his performance appraisals for several ratings periods were long overdue. Since 1992, Larson had only received two appraisals, for the periods February 1992 through December 1993 and April 1994 through March 1995 ("the 1994–5 appraisal"). In the 1994–5 appraisal, Larson had been awarded the highest possible rating, "excellence" in "over 50%" of his performance objectives. This appraisal also contained detailed written comments regarding his responsibilities and the quality of his work. The comments on Larson's 1994–5 appraisal form are almost identical to the comments on his 1996–7 appraisal.

Larson objected to his one-day suspension and to what he claimed was an undeservedly low evaluation on his 1996–7 ap-

praisal. After exhausting other remedies, Larson filed an Individual Right of Action appeal, requesting corrective action under the Whistleblower Protection Act ("WPA"). 103 Stat. 16 (1989) (codified in scattered sections of 5 U.S.C.). The Administrative Judge ("AJ") assigned to Larson's case held a telephonic hearing in which he heard testimony from witnesses for Larson and for the Government. Following this hearing, the AJ found that Larson had satisfied his burden of establishing a prima facie case of retaliation under the WPA. *Larson v. Dep't of the Army*, DE–1221–98–0142–W–1 (M.S.P.B. Sept. 3, 1998). Specifically, he found that Larson's communications with the safety office were protected disclosures and that his suspension and his disputed performance appraisal were personnel actions within the meaning of the WPA. *Id.*, slip op. at 4–5. The AJ further found that Larson had shown by a preponderance of the evidence that his protected disclosures were a contributing factor in the challenged personnel actions. *Id.* at 6–7. Nevertheless, the AJ ultimately ruled in favor of the Army, finding that the Army had rebutted this prima facie case by presenting clear and convincing evidence that it would have taken the personnel actions in the absence of the protected disclosures.

With respect to the one-day suspension, the AJ noted that the Army had presented evidence that the suspension was due to Larson's refusal to obey a direct order. *Id.* at 7–8. The AJ also found that neither of the individuals involved in the suspension decision had a motive to retaliate against Larson. The AJ commented that the Safety Office had approved the removal of the light fixture in the igloo and had communicated this approval to Diel prior to Diel proposing the suspension of Larson. *Id.* at 8. The AJ also found that the

officer who issued the suspension, Dyer, Diel's superior officer, had no involvement in the decision to remove the light fixture. *Id.* The AJ further commented that Dyer's mitigation of the proposed three-day suspension to a one-day suspension demonstrated that he had no motive to retaliate. *Id.* Based on these findings, the AJ concluded that the Army had presented clear and convincing evidence rebutting Larson's prima facie case of retaliation.

With respect to the performance appraisal, the AJ similarly concluded that the Army had presented "ample evidence" in support of the assigned rating. *Id.* The AJ noted that both Diel and Dyer had testified as to the validity of this rating. *Id.* The AJ further reasoned that, since "successful" is not a bad performance rating and because the comments in the rating were positive, Larson's rating did not indicate retaliation. *Id.* Finally, the AJ concluded that neither Diel nor Dyer had any motive to retaliate. *Id.*

This initial decision became the final decision of the Board when the full Board denied Larson's petition for review. *Larson v. Dep't of the Army*, 83 M.S.P.R. 594 (M.S.P.B. 1999). Larson now petitions for review by this court.

## DISCUSSION

Our scope of review is limited in an appeal from a Board decision. We must affirm the decision unless it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) obtained without adherence to procedures required by law, rule, or regulation; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1994).

On appeal, neither party disputes the Board's conclusion that Larson established a prima facie case of retaliation under the WPA.[1] The parties disagree, however, over

---

1. While the Army does not agree with this conclusion, it concedes that it is supported by

whether the Army successfully carried its burden in rebutting Larson's prima facie case. Once an employee establishes a prima facie case of retaliation under the WPA, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected disclosure. 5 U.S.C. § 1221(e) (1994); *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1322 (Fed.Cir.1999). Larson contends that the Board erred in concluding that the Army presented clear and convincing evidence to rebut his prima facie case. The Army responds that there is ample evidence in the record to support the AJ's decision.

## I. *The One–Day Suspension*

■ Larson argues that the one-day suspension was retaliation for his disclosures to the Safety Office. He says that he was entitled to refuse the order in question because of his legitimate safety concerns. Larson points out that there is no evidence as to when the Safety Office approved Diel's plan to remove the light fixture. Therefore, Larson argues, the AJ incorrectly found that Diel was notified of this approval prior to his decision to suspend Larson. Finally, Larson relies on testimony that the individual who ultimately approved his one-day suspension, Lt. Col. Testowski,[2] had threatened to "slam-dunk" him if his safety concerns did not

prove to be accurate, indicating a motive to retaliate.

We agree with Larson that the AJ's conclusion is based on an erroneous and incomplete evaluation of the record. The AJ's finding that Diel and Larson learned of the Safety Office approval before Larson refused his order is not supported by substantial evidence. The record does not indicate when the Safety Office completed its investigation. Moreover, it is doubtful that this approval came before Larson refused the order. According to Diel's suspension proposal, Larson refused his order at 8:40 a.m. on November 5, the same morning that he called McBride at the Safety Office. It seems unlikely that McBride could have completed his investigation and informed Larson as to his conclusions so early on the same morning that he first learned of Larson's concerns. ·

The AJ's incorrect assumption that the removal of the light fixture had been approved led the AJ to discount the evidence that Larson was entitled to refuse the order. Notwithstanding the Army's arguments to the contrary, the AJ properly found that Larson had a reasonable belief that removing the light fixture violated a safety regulation.[3] The AJ determined that the circumstances of this case indicated that Larson's safety concerns, while ultimately incorrect, were not unreasonable. Thus, Larson may have reasonably believed that the order in question placed

substantial evidence.

2. The hearing transcript refers to Lt. Col. Testowski. Other documents in the record indicate, however, that this individual may actually be named Kiskowski. For convenience, we will refer to this individual as Testowski.

3. The Army argues that Larson was concerned about waste, and not safety, and as such was not entitled to disobey a direct order. Such concerns are subject to the general

rule that an employee must obey now and grieve later. *See Nagel v. Dep't of Health and Human Services*, 707 F.2d 1384, 1387 (Fed. Cir.1983); *Cooke v. U.S. Postal Serv.*, 67 M.S.P.R. 401, 407–08, *aff'd.* 73 F.3d 380 (Fed.Cir.1995) (unpublished table decision). The record, however, provides substantial evidence support for the AJ's conclusion that Larson was indeed concerned about safety. The fact that Larson may also have been concerned about waste does not detract from this finding.

him or others in imminent danger and, accordingly, may have been entitled to refuse this order.[4] *See Nagel,* 707 F.2d at 1387; *Cooke,* 67 M.S.P.R. at 407–08. The AJ should have considered the evidence that Larson's refusal was justified.

As for the AJ's findings that Diel and Dyer had no motive to retaliate, we conclude that they are based on erroneous evaluations of the evidence. There is no support in the record for the AJ's assumption that Diel had been informed that the Safety Office had approved his decision to remove the light fixture prior to his proposing the suspension. Indeed, there is evidence to the contrary. As noted above, the record does not indicate when McBride determined that removing the light fixture violated no regulations. McBride's trial testimony and his sworn statement describe his safety investigation but do not indicate when it was completed. In contrast, Larson contends that the safety investigation postdated the proposal of his suspension, and this contention is highly plausible in light of the facts. Diel's proposed suspension is dated November 6, the day after the incident in question and the day after McBride first learned of Larson's safety concerns. This document does not mention any communications between Diel and the Safety Office. In addition, McBride testified that he thoroughly investigated the issue, seeking input from Diel, the electricians and their supervisors, and Walt Vigil, a quality assurance ammunition specialist. McBride also testified that he researched the safety issue himself before forming his conclusion and relaying that conclusion to Diel. The thoroughness of this investigation suggests that it would have taken many hours to complete, and perhaps several days. This evidence lends credibility to Larson's contention that the

investigation and ultimate approval by the Safety Office occurred after Diel had proposed suspending Larson.

The AJ's conclusion with respect to Dyer's motive to retaliate is similarly problematic. The AJ assumed that Dyer had mitigated the proposed three-day suspension to a one-day suspension, indicating an absence of retaliation. Dyer testified, however, that he had initially approved the three-day suspension, but was overruled by his superior officer.

■ Finally, the AJ failed to address Larson's contentions that his one-day suspension was ultimately approved by Lt. Col. Testowski, who had indicated that he would "slam-dunk" Larson if his safety concerns were not correct. Michael Robinson, a witness for Larson, testified that Testowski had made a statement to this effect when he called to schedule an appointment to discuss the suspension. Robinson further corroborated Larson's description of this meeting and Testowski's hostility toward Larson. The AJ may have rejected this evidence based on an assessment of the credibility of the witnesses. Credibility findings are ordinarily entitled to great weight. *See Hambsch v. Dep't of Treas.,* 796 F.2d 430, 436 (Fed.Cir. 1986). Here, however, the AJ's decision contains no findings with respect to the credibility of these witnesses. Indeed, the AJ failed to mention any of this testimony in his decision. In addition, as noted above, it appears that the AJ was mistaken as to which individual was responsible for the final approval of Larson's suspension. Under these circumstances, we cannot conclude that the AJ properly rejected this evidence.

---

4. We do not decide the question of whether Larson's refusal was justified because the record is insufficiently developed for us to do so and because we need not do so to decide this case.

In light of these factual errors and the AJ's incomplete treatment of the testimony in the record, we cannot accept the AJ's determination that the Army presented clear and convincing evidence that it would have suspended Larson absent the protected disclosure. This determination is not supported by substantial evidence. 5 U.S.C. § 7703(c) (1994). We therefore vacate the Board's decision with respect to this issue and remand for further proceedings. On remand, the Board may review the record and may further develop the evidence at its discretion and as it deems necessary. The Board may permissibly conclude, after a full and accurate review of the evidence, that there is clear and convincing evidence rebutting Larson's prima facie case of retaliation. Alternatively, the Board may conclude that Larson has successfully established his claim of retaliation. If so, the Board may order "such corrective action as the Board considers appropriate." 5 U.S.C. § 1221(e)(1) (1994).

## II. *The Performance Appraisal*

Larson argues that the AJ overly credited Diel and Dyer's bald assertions that Larson's 1996–7 performance rating was appropriate. Larson further contests the AJ's conclusion that a "successful" rating cannot indicate retaliation.

■ We first reject the AJ's conclusion that a "successful" rating cannot constitute retaliation under the WPA. This misperceives what is prohibited under the WPA. The WPA prohibits the "tak[ing] or fail[ure] to take … a personnel action with respect to any employee …" 5 U.S.C. § 2302(b)(8) (1994). A performance appraisal is a personnel action under the WPA. 5 U.S.C. § 2302(a)(2)(A)(viii) (1994). Larson's claim is that the Army

gave him a performance appraisal that he did not deserve or, alternatively, that the Army failed to give him the performance appraisal he did deserve. Thus, Larson articulated a valid claim under the WPA. In addition, the AJ's conclusion that Larson's rating could not evidence retaliation is illogical. Larson's previous rating in his 1994–5 appraisal had been the highest possible rating, "excellence" in "over 50%" of objectives. The reduction in his rating to "success" was an adverse action that would have a negative effect on his potential for advancement.

■ Second, based on the full record, we cannot agree that the Diel and Dyer testimony provides substantial evidence in support of the AJ's conclusion that the Army rebutted Larson's prima facie case of retaliation by clear and convincing evidence. The Army is correct to point out that we defer to an AJ's credibility determinations and that such determinations are virtually unreviewable. *Hambsch,* 796 F.2d at 436. Nevertheless, we may fully consider such determinations and assess the proper weight to assign to such determinations in light of the other evidence of record.[5] *See Grubka v. Dep't of Treasury,* 858 F.2d 1570, 1574 (Fed.Cir.1988); *Wright v. U.S. Postal Serv.,* 183 F.3d 1328, 1334 (Fed.Cir.1999).

On this record, we cannot assign significant weight to the Dyer and Diel testimony. On direct examination, these witnesses did little more than assert that Larson's performance evaluation properly reflected his performance. Neither described the basis for the evaluation, and neither indicated why the evaluation was lower than Larson's 1994–5 appraisal. In addition, the AJ did not make any specific credibility determinations with respect to

---

**5.** Here the AJ conducted a telephonic hearing, so the AJ's observations of the witnesses were somewhat limited.

this testimony. *See Hillen v. Dept. of the Army*, 35 M.S.P.R. 453 (1987) (requiring an administrative judge to explicitly consider certain factors when making a credibility consideration, including the character and demeanor of the witness and any inconsistencies in testimony). Thus, we have little or no basis for concluding that the AJ considered their testimony particularly credible, aside from the AJ's reliance on that testimony. We also note that the AJ unduly limited Larson's attempts to cross-examine these witnesses. For example, when Larson attempted to question Diel about what performance standards were used to prepare his performance appraisal, the AJ halted this legitimate line of inquiry.

Finally, the AJ's faulty conclusion that Diel and Dyer had no motive to retaliate further suggests that the AJ may have assigned too much weight to their testimony. As noted above, the AJ made the unsupported assumption that the Safety Office approved the removal of the light fixture before Diel proposed suspending Larson for disobeying a direct order. The AJ further mistakenly believed that Dyer mitigated Larson's suspension.

Aside from these problems with the AJ's assessment of this testimony, the documentary evidence casts considerable doubt on Dyer and Diel's assertions that they were not influenced by Larson's protected disclosures. A comparison of Larson's 1994–5 and 1996–7 performance appraisals indicates that the lengthy written comments on these two appraisal forms are almost identical. Indeed, the Army conceded at oral argument that these comments are "very substantially similar." Yet, despite this similarity of comments, the overall levels in these two forms were changed. The record contains no plausible explanation for the difference in these two ratings, aside from Larson's allegations of retaliation.

Accordingly, we cannot accept the Board's conclusion that the Army presented clear and convincing evidence to rebut Larson's prima facie case of retaliation with respect to his 1996–7 performance appraisal. The Board's decision is therefore vacated and the case is remanded for further proceedings in which the Board may order "such corrective action as the Board considers appropriate." 5 U.S.C. § 1221(e)(1) (1994). At a minimum such corrective action shall be to correct Larson's 1996–7 appraisal to reflect a performance level commensurate with the written comments, that is, to "excellence" in "over 50%" of objectives.

## CONCLUSION

For the reasons stated above, the Board's decision is vacated. The case is remanded for further proceedings consistent with this opinion.

*VACATED AND REMANDED.*