**Todd R. HAEBE, Petitioner,**

v.

**DEPARTMENT OF JUSTICE, Respondent.**

No. 01–3119.

United States Court of Appeals, Federal Circuit.

April 29, 2002.

Thomas G. Roth, of West Orange, NJ, argued for petitioner.

E. Michael Chiaparas, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washing-

ton, DC, argued for respondent. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Robert E. Kirschman, Assistant Director. Of counsel on the brief was Monica Pantos, Senior Attorney, Office of Counsel, Drug Enforcement Administration, of Alexandria, Virginia.

Before NEWMAN, MICHEL, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Todd R. Haebe, a Special Agent with the Drug Enforcement Agency ("DEA") in San Jose, California, appeals a decision of the Merit Systems Protection Board ("MSPB" or "Board" or "board"). In a split decision,[1] the MSPB reversed certain elements of an initial decision by an MSPB Administrative Judge ("AJ"). *See Haebe v. Dep't of Justice,* 81 M.S.P.R. 167, 176 (1999) (*"Final Decision "*). The AJ overturned the DEA's decision to remove Mr. Haebe from his position as a Criminal Investigator and ordered the DEA to reinstate Mr. Haebe and provide back pay. *Haebe v. Dep't of Justice,* No. SF-0752-97-0426-I-1, slip op. at 1, 21 (M.S.P.B., August 8, 1997) (Hughes, Admin.J.) (*"Initial Decision "*). The DEA had removed Mr. Haebe because it determined that he wrongly falsified statements on a report and failed to follow written instructions with respect to that report. *Final Decision* at 170. Because the MSPB substituted its credibility findings in lieu of the AJ's demeanor-based credibility findings without sufficiently sound reasons for doing so,

and misapplied the intent element of the falsification charge, the MSPB's decision in the *Final Decision* is arbitrary, capricious, and unsupported by substantial evidence. Accordingly, we reverse.

## I. BACKGROUND

This case arises from Mr. Haebe's law enforcement efforts on the morning of March 30, 1995, and the report he filed several weeks later describing the events of that morning. The incident in question on the morning of March 30 resulted in Mr. Haebe reporting to authorities in Portland, Oregon that a Mr. Ricardo Ortiz Alcala would be arriving in Portland on a flight that morning. This resulted in the arrest of Mr. Alcala at the Portland airport and he was found to be carrying four pounds of methamphetamine. Mr. Haebe reported the incident on a DEA Form 6 that he signed on April 18, 1995 (the "Report"). *Initial Decision* at 2–3.

Early in the morning of March 30, 1995, Mr. Haebe was paged at home by a confidential informant ("CI") who worked as an airline ticket agent at the San Jose, California Airport. The CI contacted Mr. Haebe because the CI noticed that Mr. Alcala fit the profile of a suspected drug trafficker.[2] Airline computer records show that at 6:32 a.m., March 30, 1995, Mr. Alcala purchased, with cash, a one-way ticket from San Jose to Redmond, Oregon on a flight that went through Portland, Oregon.[3] Airline records also show that the Portland-bound flight departed at 7:00 a.m. that morning. The Portland authori-

---

1. Vice Chair Slavet dissented from the opinion of the other two MSPB members with respect to the issues on appeal here. *Haebe v. Dep't of Justice,* 81 M.S.P.R. 167, 187–88 (1999).

2. Several DEA Agents, including Mr. Haebe, originally recruited the CI to provide information to assist in their law enforcement efforts. The CI was paid for information and ex-

pressed that the motive for being an informant was monetary. In generally recruiting confidential informants, the agents emphasize to the candidates that they will place the utmost emphasis on protecting the informant's anonymity.

3. Mr. Alcala used the name Pedro Salas to purchase the ticket for the flight to Oregon.

ties intercepted Mr. Alcala in Portland and found him carrying four pounds of illegal narcotics. The authorities arrested Mr. Alcala, but later dropped his prosecution due to alleged falsifications in the Report.

The DEA's Office of Professional Responsibility investigated the Report and eventually filed two charges against Mr. Haebe. The first charge, with five specifications, was Making False Statements. The second charge, with two specifications, was Failure to Follow Written Instructions. In leveling these charges, the DEA in essence alleged that Mr. Haebe never went to the San Jose Airport on the morning of March 30, 1995, and thus never observed Mr. Alcala directly. Rather, under the DEA's theory, Mr. Haebe took the observations of the CI and used them as his own when he wrote the Report.

Based on these charges, the DEA removed Mr. Haebe, effective on March 14, 1997. Mr. Haebe filed a timely appeal to the MSPB. The MSPB assigned the case to the AJ, who held a hearing and took testimony from various witnesses, and issued his initial decision. The AJ reversed all specifications of both charges against Mr. Haebe. The Department of Justice ("DOJ") filed a timely petition for review by the full MSPB. The MSPB granted the petition for review, and overturned the AJ's decisions on charge one, specifications two and three, and charge two, specification one. Mr. Haebe filed a timely appeal to this court for charge one. We have jurisdiction over Mr. Haebe's appeal pursuant to 28 U.S.C. § 1295(a)(9). The con-

tent of both the AJ's initial decision and the MSPB's reversal are central to the disposition of this case. We will discuss each decision in turn for those charges and specifications that the MSPB reversed, however, Mr. Haebe seeks our review only for the specifications under charge one.

## A. The AJ's Initial Decision

The AJ's twenty-page opinion reflects a three-day hearing and extensive consideration and discussion of disputed issues that the AJ resolved in large measure based on his assessment of the credibility and demeanor of the various witnesses who testified.[4] As recognized by the MSPB, "to sustain a falsification charge, the agency must prove by preponderant evidence that the employee knowingly supplied incorrect information with the intention of defrauding or deceiving the agency." *Final Decision* at 176 (citing *Coleman v. Dep't of the Air Force*, 66 M.S.P.R. 498, 506 (1995), *aff'd*, 79 F.3d 1165 (Fed.Cir.1996) (Table)).

*Presence of Mr. Haebe at the San Jose Airport—charge one, specification two*

The DEA charged that Mr. Haebe made knowingly false statements about his observations of Mr. Alcala, in essence alleging that Mr. Haebe did not go to the San Jose Airport that morning in response to the page from the CI. In his Report, Mr. Haebe stated that he observed Mr. Alcala purchase the ticket, appear nervous, and saw him proceed through security to the gate, avoiding eye contact at security and looking around as if to identify law enforcement.[5] The Report indicated that

---

**4.** During the hearing the AJ personally questioned many of the witnesses at length.

**5.** The precise wording from the relevant section of the Report is as follows:

On March 30, 1995, at approximately 6:50 a.m., S/A Haebe observed a Mexican male adult approach the ticket counter at the Alaska Airlines in San Jose Terminal. The individual appeared very nervous when ap-

proaching the ticket counter and when purchasing the ticket.... Upon purchasing the ticket the individual walked directly to the magnetometer area and entered the gate. The individual looked around a lot, as if to identify law enforcement in the area. The individual also avoided eye contact with the security at the magnetometer area. The individual quickly boarded the plane.

this occurred at "approximately 6:50 a.m." *Initial Decision* at 8.

Throughout the case, Mr. Haebe maintained in both his deposition and hearing testimony that he personally made these observations of Mr. Alcala documented in the Report. The AJ characterized the DEA's view of the situation as "based on the contention that known times of events precluded [Mr. Haebe] from carrying out his claimed observations." *Id.* at 8. The AJ noted that the only two times not based on the recollection of witnesses are the times supplied by the airline records, a ticket sale at 6:32 a.m., and departure of the flight at 7:00 a.m.

Mr. Haebe testified to the AJ as follows. He received the page from the CI between 6:00 6:30 a.m. on the morning of March 30. Mr. Haebe called the CI and discovered that Mr. Alcala inquired about a flight to Redmond, Oregon. This piqued Mr. Haebe's interest because of another arrest several weeks earlier of a person carrying methamphetamine who wanted to travel to Redmond. The CI described Mr. Alcala as a Hispanic adult male, wearing a black

sweatshirt[6] and a gold ring. After the call with the CI, Mr. Haebe drove to the airport immediately, which is nine and a half miles from his house, taking about ten minutes for the trip.[7] He parked and upon entering the terminal saw an individual that appeared to be Mr. Alcala, although wearing a grey sweatshirt. He then went back outside to see if anyone was waiting for Mr. Alcala, and continued to observe him from that vantage.[8] He saw Mr. Alcala interact with the CI in a way that he presumed was the purchase of a ticket and saw him go through security.[9] Then, Mr. Haebe waited in an airport deli to ensure that Mr. Alcala boarded the plane, and saw him near the gate. Mr. Haebe does not own a watch and uses his pager for his timepiece, but forgot to bring it to the airport, and thus estimated the time as "approximately 6:50 a.m." in the Report based on the departure time of the flight. Mr. Haebe then went home and the CI called him again to relate that Mr. Alcala purchased the ticket with cash and that it was one-way without a prior reservation.[10] *Id.* at 9–10.

---

**6.** Generally Mr. Haebe's testimony was very consistent between his deposition during the Office of Professional Responsibility's investigation compared to his hearing testimony. However, the record of his deposition showed that he said the CI told him that Mr. Alcala's sweatshirt was grey, whereas at the AJ's hearing he said the CI told him it was black. Mr. Haebe told the AJ that his earlier testimony was in error. *Initial Decision* at 9. The AJ credited this statement because Mr. Haebe reported to the authorities in Portland that Mr. Alcala wore a grey sweatshirt, and because of his credibility-based acceptance of the CI's testimony on the matter. *Id.* at 16.

**7.** The length of time for the trip is the only other minor inconsistency in Mr. Haebe's deposition versus hearing testimony. In the deposition he estimated the time of the trip to be approximately fifteen minutes, but at the hearing said that it was approximately ten minutes based upon a recreation of the trip.

**8.** Mr. Haebe testified that he walked outside because in a prior case the drug smuggler had been dropped off at the airport. The AJ specifically found that the physical layout of the airport did not foreclose Mr. Haebe's testimony that he made his observations from outside while standing behind some planter boxes. *Id.* at 9–10, 15.

**9.** In Mr. Haebe's deposition he explained that based on the interactions he observed at the ticket counter he presumed that Mr. Alcala was purchasing a ticket, but that Mr. Haebe did not directly see the ticket being "punched out."

**10.** In its investigation the Office of Professional Responsibility discovered that a reservation had in fact been made for the flight, but that the CI was unaware of that fact.

The AJ recognized that Mr. Haebe's credibility was of the utmost importance. The AJ found Mr. Haebe to have an extraordinarily high reputation for honesty, integrity and devotion to duty.[11] The DEA needed to prove its case by a preponderance of the evidence, yet its allegations were based in part on the improbability that Mr. Haebe could have made it to the airport in time. The testimony of the CI was critical on these points, in particular the issue of whether the CI initially called Mr. Haebe before or after the ticket was sold to Mr. Alcala, and, less critically, whether the CI called Mr. Haebe once or twice. If the CI first called after Mr. Alcala's initial inquiry, this would support Mr. Haebe's version of events and rebut the DEA's arguments about the timing: the first call could have been early enough to allow Mr. Haebe to be at the airport to observe Mr. Alcala purchase the ticket at 6:32 a.m.

The CI was interviewed and deposed a number of times from the beginning of the investigation up to the hearing, and also submitted affidavits. *See Final Decision* at 178 n. 4. While noting that among the CI's various statements there were some differences, the AJ noted that they were not great differences. *Initial Decision* at 12 n. 16. Significantly, in the CI's last two affidavits and at the hearing, the CI testified that Mr. Alcala approached the ticket counter twice, after the first encounter the

CI paged Mr. Haebe, but the CI could not remember whether Mr. Alcala purchased the ticket on the first or second visit. *Id.* at 13.

Although the CI's memory of the incident was not complete, based on the CI's testimony the AJ found the CI to be honest and credible, and the AJ explicitly based this credibility finding on the CI's demeanor.[12] The AJ found that the CI's testimony supported Mr. Haebe's version of the events because if the CI first called Mr. Haebe after Mr. Alcala's initial inquiry, this would enable Mr. Haebe to be at the airport to observe Mr. Alcala purchase the ticket at 6:32 a.m. Given the findings in the CI's testimony, the AJ concluded that the DEA had not proven its case on this second specification of charge one.[13] *Id.* at 15.

*Observation of Mr. Alcala's bag—charge one, specification three*

The DEA charged that Mr. Haebe included the following statement in the Report: "[t]he individual checked one bag described as a brown bag with vinyl stripes on it;" and that when read in context the statement conveys the impression that Mr. Haebe observed the bag. Mr. Haebe testified that he did not see what, if anything, Mr. Alcala checked as baggage,[14] but that he intentionally used passive, ambiguous language, *i.e.,* "described as," to protect the CI by not acknowledging the

**11.** Mr. Haebe's credibility evidence included the unrebutted testimony of five character witnesses. *Id.* at 10–11.

**12.** Although the CI did not specifically remember calling Mr. Haebe a second time, the AJ found that the CI probably did so based on the CI's testimony that the CI temporarily entered the plane to observe Mr. Alcala and be sure that he actually boarded.

**13.** The AJ also addressed several other potential counter arguments to his conclusion, in each case demonstrating his findings were

either not inconsistent with, or were explainable in light of, these arguments and the other DEA objections and arguments. *Initial Decision* at 15–18. In particular, the AJ surmised, in part based on Mr. Haebe's testimony on the other specification of this charge, that Mr. Haebe's motive in omitting the CI in the Report was to conceal the identity of the CI, an admitted policy and goal of the San Jose DEA office.

**14.** Mr. Haebe testified that the CI provided him the description of the bag when the CI called him a second time.

existence of the CI in the Report. The AJ, along with other witnesses who evaluated the statement, however, felt that the statement potentially conveyed the impression that Mr. Haebe personally observed the bag. Thus, this third specification of charge one is related to the second specification in that if the AJ found that Mr. Haebe never went to the San Jose Airport, that finding supports a need and motivation to also falsify the bag statement. Conversely, a finding that Mr. Haebe did go to the airport supports Mr. Haebe's version of the events that while he did not see the bag, he related the CI's observation, with an attempt at ambivalence as to source, to protect the CI.

The AJ described the testimony of Mr. Haebe's immediate and second-level supervisors, explaining that the San Jose DEA had a policy of concealing that a CI was involved in an incident. *Initial Decision* at 5–6. The agent could apply this policy when he or she believed it to be advisable. Mr. Haebe testified that he was following this policy when he completed the Report. *Id.* at 5. According to the second-level supervisor's testimony, the primary stipulation to the policy was that in concealing a CI's identity the agent should have personally observed the events reported. Mr. Haebe's immediate supervisor, Mr. Meyrick, testified that the statement about the bag was not a falsification and fell within the policy.[15] While the AJ found the statement potentially deceptive, he did not think it was unarguably false, and found that it could be interpreted either way. More importantly, based on the testimony

of Mr. Haebe's supervisors, the AJ determined that the San Jose DEA office had a policy of concealing information about confidential informants. The AJ concluded that the DEA had not brought a valid charge when Mr. Haebe's immediate supervisor testified that the statement fell within the policy. Thus, the DEA had not proven its case on this third specification of charge one. *Initial Decision* at 18–19.

*Failure to distribute a copy of the Report to the Portland DEA—charge two, specification one*

The DEA charged that Mr. Haebe failed to distribute the Report to the Portland, Oregon, DEA office, and that this constituted a failure to follow written instructions. Mr. Haebe testified that he simply made an error and forgot to check a box on the form to indicate distribution to the Portland Office. Both his immediate supervisor, Mr. Meyrick, and his second-level supervisor, Mr. London, testified that they regarded the omission as simply a clerical error, frequently made by agents, and an issue of joint responsibility because an agent's supervisors are supposed to correct the report when they sign off on it.[16] The DEA, on the other hand, claimed that Mr. Haebe knew that he was falsifying the Report, and therefore wished to keep it away from the Portland DEA office. Thus, like the charge concerning the bag, this first specification of charge two is related to the second specification of charge one: if the AJ's findings are correct that Mr. Haebe did go to the airport and thus did not falsify the Report, then

15. Mr. Haebe's second-level supervisor, Mr. London, however, believed the statement did not effectively apply the policy's stipulation that an agent must personally observe the events, even if they adopt the observations of a confidential informant. *Id.* at 19.

16. The immediate supervisor, Mr. Meyrick, testified that he corrected six to seven reports

a day, checking the box to indicate distribution to a remote DEA office. The second level supervisor, Mr. London, testified that it was his responsibility to catch the omission since he also signed off on the Report. Mr. Meyrick estimated that he had made hundreds of similar omissions during his career.

he had no motivation to withhold the Report from the Portland DEA office.

The AJ credited the testimony of Mr. Haebe's supervisors that the omission was a simple clerical error, and credited Mr. Haebe's testimony that the error was inadvertent and not motivated by a desire to keep the allegedly falsified Report away from the Portland DEA office. Therefore, the AJ concluded that the DEA had not proven its case that this first specification of charge two warranted formal discipline. *Initial Decision* at 4.

## B. The MSPB's Final Decision

The MSPB sustained the AJ's reversal of the DEA regarding charge one, specifications one, four, and five, as well as charge two, specification two.[17] However, the MSPB held that the AJ erred in his analysis of charge one, specifications two and three, as well as charge two, specification one, and overturned those portions of the AJ's decision. The foundation of the MSPB's decision is that intent can be proven by circumstantial evidence, and, moreover, that inaccurate statements, not credibly or reasonably explained, are circumstantial evidence of deception and allow a strong inference of culpability. *See*

*Final Decision* at 176 (citing *Stein v. United States Postal Serv.*, 57 M.S.P.R. 434, 439 (1993); *Davis v. Dep't of the Air Force*, 27 M.S.P.R. 521, 524 (1985)). The MSPB also cited *Jacobs v. Dep't of Justice*, 35 F.3d 1543, 1548 (Fed.Cir.1994), in acknowledging that some evidence points in Mr. Haebe's direction. *Final Decision* at 176.

### Presence of Mr. Haebe at the San Jose Airport—charge one, specification two

The MSPB strung together various circumstantial evidence findings to conclude that the preponderance of the evidence showed that Mr. Haebe falsified the observations he recorded on the Report by adopting the information the CI gave him. *Id.* at 176–77. Expressly acknowledging that its finding was "contrary to the AJ's finding," and citing interviews of the CI early in the investigation, the MSPB found that the CI called Mr. Haebe after Mr. Alcala purchased his ticket, *id.* at 177, rather than after the initial inquiry by Mr. Alcala as the CI testified to the AJ. The MSPB supported its counter-finding with the following observations: (i) the CI had stated that normally the CI paged an agent after a ticket was purchased, even

---

**17.** The charges reversed by the AJ, with the reversal sustained by the MSPB, are as follows:

Under charge one, specification one, the DEA alleged that Mr. Haebe falsely stated that his partner was with him at the San Jose Airport. The AJ found that this was a simple, clerical error by Mr. Haebe resulting from use of "boilerplate" to fill out the Report. *Initial Decision* at 7–8.

Under charge one, specification four, the DEA alleged that Mr. Haebe falsely stated that he contacted the ticket agent who sold Mr. Alcala the ticket. The AJ found that there was no evidence to support this charge because the CI never told Mr. Haebe that anyone else was involved in the ticket sale, and Mr. Haebe saw Mr. Alcala interact with the CI in a way that would lead one to reasonably

assume that a ticket was being sold. *Id.* at 19–20.

Under charge one, specification five, the DEA alleged that Mr. Haebe falsely stated that Mr. Alcala did not have a prior reservation for his flight. The AJ found that there was no evidence to support this charge because Mr. Haebe was using the information from the CI, who probably conveyed this impression. *Id.* at 20–21.

Under charge two, specification two, the DEA alleged that when Mr. Haebe failed to disclose that his information came from the CI that he failed to follow written instructions requiring him to "fully, exactly and plainly" describe the events documented in the Report. The AJ found that there was no violation because Mr. Haebe was following San Jose DEA office policy to protect the identity of confidential informants. *Id.* at 5–6.

though the CI recalled at least one occasion where the CI made a call after a mere inquiry;[18] (ii) Mr. Haebe's partner testified that he received a page from Mr. Haebe between 6:30 a.m. and 7:00 a.m., called Mr. Haebe, and learned that Mr. Haebe was responding to an airport incident, facts which to the MSPB implied that the CI did not page Mr. Haebe before the ticket was purchased because Mr. Haebe would have called his partner after the first alert by the CI; and (iii) even if Mr. Haebe received the CI's call before the ticket was purchased and made it to the airport in time to see the ticket purchased at 6:32 a.m., the other events described by Mr. Haebe took "up too little time to fill up a half-hour of waiting around the airport." *Id.* at 178.

Based directly on its circumstantial evidence counter-finding that the CI first called Mr. Haebe after Mr. Alcala purchased the ticket, the MSPB found that Mr. Haebe did not observe Mr. Alcala before he boarded the plane. To support this inference, the MSPB explained how the timing could not have possibly worked out, especially given the CI's statement that the CI saw Mr. Alcala in his window seat on the plane at "approximately 6:45 a.m." *Id.* at 178–79. The MSPB compiled additional circumstantial evidence against Mr. Haebe.[19] It then noted that Mr.

Haebe admitted that he did not actually see the ticket purchase transaction, but merely saw Mr. Alcala at the ticket counter momentarily. The MSPB found these statements to be in reckless disregard for the truth, which in its view supported an inference of intent. *See Final Decision* at 181 (citing *Bryant v. Dep't of Justice,* 39 M.S.P.R. 632, 636 (1989)). On a whole, the MSPB concluded, the circumstantial evidence supported an intent to deceive, and Mr. Haebe never explained why the statements on the Report were incorrect,[20] therefore, the second specification of charge one was proven by a preponderance of the evidence. *Id.*

*Observation of Mr. Alcala's bag—charge one, specification three*

With respect to specification three, the MSPB overturned the AJ's conclusion because it found the AJ's determination to be primarily based on the testimony of Mr. Haebe's immediate supervisor, who stated that the Report's description of the bag was within the policy of protecting confidential informants, and the fact that Mr. Haebe was never explicitly warned that such an approach violated the policy. *Id.* at 182. Rather, according to the MSPB, the testimony of the second-level supervisor controls, who testified that the policy stipulated that an agent must personally

---

**18.** The MSPB further elaborated: "If calling after an inquiry had been such an out of the ordinary occurrence that the CI would have remembered doing it once, and [the CI] did not recall whether [the CI] did it here, we find it more likely than not that [the CI] did not call after a mere inquiry here." *Final Decision* at 178.

**19.** The MSPB added other circumstantial evidence to the heap. It noted that the physical description of Mr. Alcala given to the Portland authorities was "more typical of a CI than an experienced DEA agent," and specifically found the testimony of one of the Portland authorities more credible than Mr. Haebe's testimony without, obviously, having

heard any of the testimony firsthand. *Final Decision* at 180. The MSPB also, *ipse dixit,* found it "inherently improbable" that a trained DEA agent forget his pager and failed to locate a clock to record the time of his observations. *Id.* In addition, the MSPB recounts evidence concerning discrepancies in the color of Mr. Alcala's sweatshirt as reported by the CI and Mr. Haebe. *Id.* at 181. Finally, the MSPB noted Mr. Haebe's statements that he believed probable cause would be developed in Oregon. *Id.* at 182.

**20.** The MSPB noted that rather than explain why his statements were incorrect, Mr. Haebe "steadfastly maintained that they were correct." *Final Decision* at 181–82.

observe the events reported when drafting statements that omit the presence of a CI. *Id.* at 183.

*Failure to distribute a copy of the Report to the Portland DEA—charge two, specification one*

The MSPB held that under charge two, proof of intent is not required. *See Final Decision* at 183 (citing *Botto v. United States Postal Serv.,* 75 M.S.P.R. 471, 476 (1997); *Hamilton v. United States Postal Serv.,* 71 M.S.P.R. 547, 555–57 (1996)). As a result, the DEA had no need to prove that Mr. Haebe was motivated to keep the Report away from the Portland DEA office as opined by the AJ. Further, there is no "de minimis" exception for a charge of failing to follow written instructions. *See Final Decision* at 184 (citing *Pepper v. Veterans Admin.,* 8 MSPB 197, 8 M.S.P.R. 524, 526–28 (1981); *Ceja v. Def. Logistics Agency,* 27 M.S.P.R. 531, 533 (1985) (explaining that de minimis nature only impacts the penalty)). Because the form was not sent, the charge is met: "we find that this specification is proven and that there is a nexus between the misconduct and the efficiency of the service."[21] *Final Decision* at 184 (citing *Blevins v. Dep't of the Army,* 26 M.S.P.R. 101, 104 (1985)).[22]

## II. DISCUSSION

### A. Standard of Review

Our standard of review for MSPB decisions is governed by statute, which directs us to set aside MSPB actions, findings, or conclusions found to be:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule, or regulation having been followed; or

(3) unsupported by substantial evidence . . . .

5 U.S.C. § 7703(c) (2000).

 Under this standard, we will reverse the MSPB's decision if it is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brewer v. United States Postal Serv.,* 227 Ct.Cl. 276, 647 F.2d 1093, 1096 (Ct.Cl.1981) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126, (1938)), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982). This court's review "must determine whether, considering the record as a whole, the agency's evidence is sufficient to be found by a reasonable factfinder to meet the evidentiary burden applicable to the particular case." *Jacobs,* 35 F.3d at 1545 (quoting *Bradley v. Veterans Admin.,* 900 F.2d 233, 234 (Fed.Cir.1990)). The question before us is not how the court would rule upon a *de novo* appraisal of the facts of the case, but whether the administrative determination is supported by substantial evidence in the record as a whole. *Hayes v. Dep't of the Navy,* 727 F.2d 1535, 1537 (Fed.Cir.1984).

### B. Credibility Determinations and the Relationship Between the MSPB and Its Administrative Judges

 The MSPB "has the power to determine questions of fact and law in the first instance," however, under statute and

---

**21.** The "efficiency of the service" refers to the MSPB's description of the delay in getting the Report to the Portland DEA office, and this delay means that the Portland DEA office lost the opportunity to correct deficiencies in the Report at an earlier stage. *Id.* at 183–84.

**22.** Given that Mr. Haebe has not appealed the first specification of charge two to this Court, we express no opinion as to the correctness of the MSPB's analysis of this charge of failing to follow written instructions by failing to check a box to have the form distributed to a remote DEA office.

by regulations it has promulgated, the MSPB may refer cases to an administrative judge to make an initial decision which only becomes final after the deadline for petition to review[23] expires or through other procedural mechanisms. *See* 5 U.S.C. § 7701(b) (2000); 5 C.F.R. §§ 1201.4(a), 1201.41, 1201.111 (2002); *Connolly v. United States*, 766 F.2d 507, 512–13 (Fed.Cir.1985). An administrative judge "does not have an independent statutory basis for his jurisdiction. [She or he] hears only those cases referred to him by the [MSPB]." *Connolly*, 766 F.2d at 512 (explaining that such a scheme forecloses customary standards of appellate review and that the MSPB can substitute its judgment for that of one of its administrative judges (citations omitted)).[24]

■ There is an exception to this otherwise straightforward description of the MSPB's power when the MSPB invokes its privilege to refer and delegate a case to an administrative judge. By availing itself of the privilege established under its own regulations, the MSPB is not free to overturn an administrative judge's demeanor-based credibility findings merely because

it disagrees with those findings.[25] *Kimm v. Dep't of Treasury*, 61 F.3d 888, 892 (Fed.Cir.1995) (citing *Chauvin v. Dep't of Navy*, 38 F.3d 563, 566 (Fed.Cir.1994)); *Jackson v. Veterans Admin.*, 768 F.2d 1325, 1331 (Fed.Cir.1985).

Although not necessarily a counter-balance to the full MSPB's power, we have sanctioned this deference requirement as springing from a fundamental notion of fairness as expressed by this court in *Jackson*: "great deference must be granted to the trier of fact who has had the opportunity to observe the demeanor of the witnesses, whereas the reviewing body looks only at 'cold records.'" *Jackson*, 768 F.2d at 1331 (citations omitted). In *Jackson*, this court held that the deference requirement derived from the substantial evidence standard expressed by the Supreme Court in *Universal Camera v. National Labor Relations Board*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and interpreted by the Ninth Circuit in *Penasquitos Village, Inc. v. National Labor Relations Board*, 565 F.2d 1074, 1078 (9th Cir.1977), and the Supreme Court's recognition that the "evidence sup-

**23.** After an initial decision by an administrative judge, parties who desire additional review invoke a petition for review under 5 C.F.R. § 1201.115(d), which provides:

(d) The Board, after providing the other parties with an opportunity to respond, may grant a petition for review when it is established that:

(1) New and material evidence is available that, despite due diligence, was not available when the record closed; or

(2) The decision of the judge is based on an erroneous interpretation of statute or regulation.

The regulation sets out two conditions where the MSPB may grant review; it does not limit the MSPB's authority to review, which is plenary. *Connolly*, 766 F.2d at 510–12; *see also* 5 U.S.C. § 7701(e)(1)(B) (2000) (specifying that the Board may reopen and reconsider a decision of an administrative judge).

**24.** As raised with respondent's counsel at oral argument, the Court notes with displeasure the citation to *Connolly* in respondent's brief at page sixteen that quotes from *Connolly*, but omits the statements requiring deference to AJ credibility determinations without indicating in any way the material omitted from the quotation.

**25.** Obviously, the MSPB benefits by referring and delegating cases to administrative judges for adjudication because it can process more cases using that procedure. The consequence for petitioners of this hierarchy is that most petitioners will only have their case heard by an AJ unless they can meet the petition requirements of 5 C.F.R. § 1201.115(d), or the MSPB decides of its own accord to review a case.

porting a conclusion may be less substantial when an impartial, experienced [administrative judge] who has observed the witnesses and lived with the case has drawn conclusions different from the Board's [conclusions] than when he has reached the same conclusion." *Universal Camera*, 340 U.S. at 496, 71 S.Ct. 456; *see also Penasquitos Village*, 565 F.2d at 1078 ("evidence in the record which, when taken alone, may amount to 'substantial evidence' and therefore support the Board's decision, will often be insufficient when the trial examiner has, on the basis of the witnesses' demeanor, made credibility determinations contrary to the Board's position"); *Connolly*, 766 F.2d at 512 ("When, as here, the decision of the full board differs from that of its presiding official, this court will engage in a more searching scrutiny of the record.") (citing *Curran v. Dep't of the Treasury*, 714 F.2d 913, 915 (9th Cir.1983)).

▋ Thus, with respect to conflicting determinations concerning demeanor-based credibility, the administrative judge "is without question the better judge of who to believe." *Jackson*, 768 F.2d at 1332. Accordingly, we have held:

[w]hen, as with a determination concerning a witness's state of mind, the AJ's finding is explicitly or implicitly based on the demeanor of a witness, the board may not simply disagree with the AJ's assessment of credibility.... If the board reverses such a finding, we will

not sustain its decision on appeal unless the board has articulated sound reasons, based on the record, for its contrary evaluation of the testimonial evidence.

*Kimm*, 61 F.3d at 892 (citing *Chauvin*, 38 F.3d at 566); *see also Jackson*, 768 F.2d at 1331.

Both Mr. Haebe and the government present to us an intricate twist to the deference requirement, asserting that there are two levels or thresholds of deference, as follows: the MSPB must give (i) deference to the administrative judge's findings based on issues of credibility, *Connolly*, 766 F.2d at 512, and (ii) "special deference" where such findings are implicitly or explicitly based on the demeanor of witnesses who testified before an administrative judge, *Chauvin*, 38 F.3d at 566; *Jackson*, 768 F.2d at 1331. We, however, do not read our precedent as creating or endorsing any such distinction because our cases have only required deference when an administrative judge was able to observe the demeanor of a testifying witness and, as a result, the administrative judge's findings were explicitly or implicitly based on the demeanor of a witness.[26] The parties' confusion as to the deference requirement is perhaps a result of haphazard use in the case law of the terms "deference" and "special deference" and variations of those terms in relation to the concepts of credibility and demeanor.[27]

---

**26.** *See Kimm*, 61 F.3d at 892; *Chauvin*, 38 F.3d at 566; *Jackson*, 768 F.2d at 1332.

**27.** The maxim of deference can be demanding in its application because courts have sometimes struggled to discern the appropriate and relative scope of the terms "credibility" and "demeanor." *See Kopack v. Nat'l Labor Relations Bd.*, 668 F.2d 946, 953 (7th Cir. 1982) ("We now turn our attention to the ambiguity in *Universal Camera* with which courts have most frequently grappled: the range of meaning connoted by the term 'cred-

ibility.' "). The term "credibility" denotes "[t]he quality that makes something (such as a witness or some evidence) worthy of belief." Black's Law Dictionary 374 (7th ed.1999). "Demeanor," by contrast, relates to "[o]utward appearance or behavior, such as facial expressions, tone of voice, gestures, and the hesitation or readiness to answer questions." *Id.* at 442. Accordingly, demeanor is but one factor that may be considered by the trier of fact on the ultimate, broader, issue of credibility.

In order to dispel such confusion, we hold that there is only one level of deference. This sole deference requirement applies when the administrative judge's credibility determination is based on observations of the demeanor of a testifying witness such that the administrative judge's findings were explicitly or implicitly based on such observation of demeanor. This is consistent with our precedent and *Connolly* is not in opposite effect. While *Connolly* provides a meager textual hook for the parties' assertion of two levels of deference,[28] it otherwise fails to support a distinction of multiple levels of deference.[29] Whether it be referred to as "special deference," "deference" or "demeanor-based deference," herein or in our precedent, the deference requirement is unitary and is fundamentally related to the observation of witness' demeanor.

The consequence of the deference requirement is that if the MSPB's reasons for overturning demeanor-based credibility determinations are not sufficiently sound, its decision does not survive substantial evidence review. *Chauvin*, 38 F.3d at 566 ("[T]he board majority did not articulate a sufficient reason for its disbelief of Chauvin's testimony."). In light of the "sufficiently sound" requirement for overturning AJ credibility determinations, the MSPB has established procedural directives for administrative judges under its decisions in *Hillen*[30] and *Spithaler*[31] in order to promote the establishment of a full record for

---

**28.** Our opinions in *Jackson, Chauvin,* and *Kimm* refer to this single level of deference as "special deference," a phrase that the opinion in *Jackson* borrowed from the Ninth Circuit's opinion in *Penasquitos Village. See Jackson*, 768 F.2d at 1331. Our opinion in *Connolly*, however, refers simply to "deference," engendering the potential for one to argue that multiple levels of deference apply.

**29.** The *Connolly* court affirmed the MSPB's decision to substitute its findings for those of the administrative judge. Although acknowledging that the MSPB must accord deference to the administrative judge "on issues of credibility," the court was not faced with any disagreement that required it to determine whether the MSPB had erred. *Connolly*, 766 F.2d at 512 ("[T]he Board and its presiding official agreed on the basic facts underlying the charges against Connolly. With respect to credibility, the determinations of the presiding official cut against Connolly's case."). The MSPB properly substituted its findings as to the three charges against Connolly, we held, because the administrative judge had committed errors of law. *Id.* at 513. Thus, there was no reason for the *Connolly* court to consider the issue of divergent administrative judge versus MSPB credibility determinations, an issue addressed for the very first time in *Jackson* one month later. *Jackson*, 768 F.2d at 1330 (noting that the "issue has not previously been addressed by our court"). Further, in *Connolly*, Mr. Connolly neither provided live testimony nor brought forth witnesses on his behalf. *See Connolly*, 766 F.2d

at 509. Thus, the administrative judge based his credibility determination (as to Mr. Connolly) upon documents in the "cold record." Deference for such testimony is not required. *See Universal Camera*, 340 U.S. at 496, 71 S.Ct. 456.

**30.** *Hillen v. Dep't of the Army*, 35 M.S.P.R. 453, 458 (1987).

To resolve credibility issues, an administrative judge must first identify the factual questions in dispute; second, summarize all of the evidence on each disputed question of fact; third, state which version he or she believes; and, fourth, explain in detail why the chosen version was more credible than the other version or versions of the event. Numerous factors, which will be considered in more detail below, must be considered in making and explaining a credibility determination. These include: (1)[t]he witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.

*Id.* at 458.

**31.** *Spithaler v. Office of Pers. Mgmt.*, 2 MSPB 2, 1 M.S.P.R. 587, 589 (1980) (an initial deci-

the MSPB's review. Concomitantly, in our assessment of the AJ's decision, we remain conscious of the *Hillen* and *Spithaler* requirements.[32]

■ When the demeanor-based deference requirement is not in play, the MSPB is free to re-weigh the evidence and substitute its own decision as to the facts or the law commensurate with the substantial evidence standard, *Jackson,* 768 F.2d at 1330, but it cannot substitute its judgment on issues of credibility based on the demeanor of witnesses.

## C. Analysis

The DOJ argues that the MSPB is not overturning the AJ's credibility determinations but is instead reweighing the evidence more completely or differently than the AJ, all the while fully "acknowledging" the AJ's demeanor-based credibility findings. We find that this characterization of the *Final Decision* understates the reach and grasp of the MSPB's analysis and misapplies the standards we have articulated in *Jackson, Chauvin* and *Kimm.* The DEA needed to prove its case by a preponderance of the evidence, which is the "degree of relevant evidence that a reasonable person, considering the record as a whole,

would accept as sufficient to find that a contested fact is more likely to be true than untrue." 5 C.F.R. § 1201.56(c)(2) (2001). Our review is to determine whether the MSPB had substantial evidence to conclude that the DEA so proved its case, but in evaluating substantial evidence we review whether the MSPB properly applied the demeanor-based deference requirement.

*Presence of Mr. Haebe at the San Jose Airport—charge one, specification two*

The DOJ argues that intent can be inferred from circumstantial evidence. While we agree with this proposition at some level, here the MSPB carried the principle too far and eviscerated the critical and valid demeanor-based credibility findings made by the AJ. The DOJ offered reasons for its substituted findings, but its proffered reasons are not sufficiently sound to carry the day. Central in the MSPB's error is its finding that the CI first called Mr. Haebe after the ticket was purchased. By substituting this finding for the AJ's demeanor-based finding that the CI testified to have first called Mr. Haebe after the initial inquiry by Mr. Alcala,[33] the MSPB turned the case on its head.

---

sion must identify all material issues of fact and law, summarize the evidence, resolve issues of credibility, and include the administrative judge's conclusions of law and his legal reasoning, as well as the authorities on which that reasoning rests).

**32.** Because *Hillen* and *Spithaler* are MSPB cases, and are rarely cited in our precedential opinions, *see Wissman v. Social Sec. Admin.,* 848 F.2d 176 (Fed.Cir.1988) (noting that *Spithaler* is "nothing more than the board's directive to its subordinate officials to proceed according to established regulatory procedures"); *Larson v. Dep't of the Army,* 260 F.3d 1350 (Fed.Cir.2001) (noting that the record was not sufficiently developed by the AJ under *Hillen* to allow review), we express no opinion as to the correctness of those opinions nor do we sanction them as our authority by our

reference to them herein. Rather, we view *Hillen* and *Spithaler* as general internal procedural requirements that the MSPB has established for its adjudicative processes, and our review of the AJ's fulfillment of these procedural processes is in that light. However, we note that after additional proceedings before administrative judges and the MSPB, the parties in *Hillen* eventually sought review in this court for issues unrelated to credibility. *King v. Hillen,* 21 F.3d 1572, 1583–84 (Fed. Cir.1994) (holding that the MSPB improperly applied the legal standard for sexual harassment).

**33.** The testimony of the CI that the AJ credited is as follows:

> [T]he suspect approached the ticket counter on two separate occasions that morning

■ Clearly, the AJ's findings with respect to the CI's testimony deserve demeanor-based deference. *Chauvin,* 38 F.3d at 566; *Jackson,* 768 F.2d at 1331. The AJ explicitly stated that he "carefully observed the CI's demeanor during [the CI's] testimony." *Initial Decision* at 14. Although recognizing that the CI's memory may have been faulty, the AJ found the CI to be attempting to answer honestly after having explained to the CI not to allow either party to lead the testimony. *Id.* Then, the AJ stated that based on the CI's "demeanor, I find that [the CI's] later statements and testimony are credible . . . [and the CI] has not foreclosed the possibility that [the CI] called [Mr. Haebe] after an initial inquiry by Mr. Alcala, and . . . again after seeing Mr. Alcala on the plane." *Id.*

■ The MSPB seeks to alter this finding with an amalgamation of circumstantial evidence, which might be persuasive against a baseline substantial evidence review, but which definitely does not stand up under the demeanor-based deference requirement. In short, with proper attribution to the AJ's findings, the MSPB has not shown by substantial evidence that a reasonable fact-finder would have found it more likely than not that the CI only first called Mr. Haebe after the ticket was purchased. *See Chauvin,* 38 F.3d at 566.

The AJ recognized as much when he concluded that the DEA had not proven this point. *Initial Decision* at 15.

The DOJ argues that the MSPB provided sufficiently sound reasons to substitute its findings for that of the AJ. These reasons spring from the imprecision of the CI's earlier interviews and statements.[34] However, the AJ specifically noted that the CI's earlier statements were not precise. The AJ understood that the CI did not remember everything about the event and that this created the potential for conflict between the CI's testimony and that of Mr. Haebe. Thus, the AJ was aware of this aspect of the CI's credibility as a witness, and seems to have factored this into his assessment of the CI's demeanor and credibility. Nowhere in the record is it suggested that the CI was directly lying, or that other undisputed evidence directly contradicted the CI's testimony. The other evidence fits into the CI's recollection of events, especially when the fact-finder allows for the possibility of two visits to the ticket counter by Mr. Alcala and the first call after the initial inquiry, as testified by the CI, and two phone calls from the CI, as testified by Mr. Haebe. In other words, to the extent there is any question as to whether the AJ explicitly based his findings on the CI's demeanor due to the CI's prior less-precise statements, we hold

---

before he got on the flight. I do not recall whether it was the first or second occasion that he actually purchased the ticket. I do recall, however, that it was after the first occasion that I paged Agent Haebe. I also know that at some point after I spoke to Agent Haebe, the suspect again approached the ticket counter.

*Initial Decision* at 13.

34. A sampling of these items, which are not sufficiently sound reasons, includes: (i) the CI did not actually sell the ticket to Mr. Alcala, the CI's co-worker did, but the CI was present and observed Mr. Alcala and made the call to Mr. Haebe because the co-worker did not

want to get involved; (ii) in the early interviews and statements the CI was not sure when the CI had called Mr. Haebe; and (iii) that normally the CI called after a ticket was purchased. Equally unavailing are the MSPB's asserted implications allegedly arising from Mr. Haebe's phone call to his partner on the morning of March 30, 1995, *see Final Decision* at 178, or that the events described by Mr. Haebe would take up "too little time" at the airport, *id.* at 178. Finally, the arguments that the timing could not have worked out fall apart when one allows for the possibility, as the CI testified, that the CI first called Mr. Haebe after an initial inquiry by Mr. Alcala.

that the AJ implicitly factored the prior imprecision into his demeanor-based credibility determination, a result clearly allowed under *Jackson, Chauvin* and *Kimm. Kimm,* 61 F.3d at 892; *Chauvin,* 38 F.3d at 566 (holding that demeanor-based deference is required where findings are *implicitly* or explicitly based on the demeanor of witnesses who testified at a hearing) (emphasis added); *Jackson,* 768 F.2d at 1331.

Another aspect of the MSPB's error is its treatment of the AJ's findings concerning Mr. Haebe's testimony. The DOJ argues, under its false notion of two levels of deference, that the AJ's credibility determination is based only on Mr. Haebe's reputation, and therefore the MSPB need only afford deference to the AJ's findings, not special deference. Besides the error concerning two deference levels, this contention is questionable because it seems that the AJ implicitly gauged Mr. Haebe's demeanor because the AJ credited Mr. Haebe's testimony. We need not decide this point however, because under the demeanor-based deference requirement arising from the CI's testimony the MSPB's reasons for substituting its findings are not sufficiently sound.

The lack of sufficient soundness is especially apparent considering that the most important finding against Mr. Haebe's version of events is the counter-finding the MSPB made: that the CI only first called after the ticket was sold. This finding went against the CI's demeanor-based testimony which had been credited by the AJ. Remove this counter-finding from the MSPB's analysis, and its reasons for rejecting Mr. Haebe's version of events do not withstand substantial evidence review. The MSPB's reasons include some items of mere speculation by the MSPB, such as that it is "inherently improbable" that Mr. Haebe forgot his pager and failed to find a clock to record the time of his observations. These facts could just as easily support Mr. Haebe's version of events: he was rushing to the airport to respond, and at the airport kept his attention focused on Mr. Alcala from his vantage just outside the terminal. Also questionable is the MSPB's use of the assertion that the description of Mr. Alcala was "more typical of a CI." Again, to the extent there was sparseness in the description, this could also support Mr. Haebe's version of events: his observation points were never close enough to note additional specific details. The MSPB even uses against Mr. Haebe his continual contention that his observations of Mr. Alcala, other than the luggage bag, were correct and his own. The MSPB says Mr. Haebe's failure to explain why his statements are incorrect is evidence against him. But this rather seems akin to saying that the fact that Mr. Haebe will not confess is a reason to believe him guilty. This in essence reverses the burden of proof against Mr. Haebe. The fact that these alternative interpretations of the evidence exist might not normally substantiate a reversal under the substantial evidence standard, however, here they demonstrate that plausible alternative views of the other, non-demeanor-based evidence, comport with the AJ's demeanor-based findings. Because an interpretation exists where the non-demeanor-based evidence does comport, the AJ's demeanor-based determinations are dispositive.

*Observation of Mr. Alcala's bag—charge one, specification three*

Under specification three of charge one, the DEA claimed that Mr. Haebe's "actions constitute making a false statement." *Initial Decision* at 18. The DEA brought this charge because it surmised that read in context, Mr. Haebe's statement that Mr. Alcala "checked one bag described as a brown bag with vinyl stripes on it" implies

or leads one to infer that Mr. Haebe observed Mr. Alcala checking such bag. *Id.* Mr. Haebe admits that he did not observe the bag. He received the bag's description from the CI. However, he repeatedly testified that his aim in completing his Report was to protect the anonymity of the CI. He sought to accomplish that aim by relying on the San Jose DEA office's policy of allowing agents to omit information concerning the involvement of a CI in a routine interdiction event.

■ For Mr. Haebe's actions to "constitute making a false statement," the agency must prove by a preponderance of the evidence that Mr. Haebe's situation falls within the standard set forth in *Naekel v. Department of Transportation,* 782 F.2d 975 (Fed.Cir.1986) and its progeny. Specifically, the DEA must prove that Mr. Haebe (i) supplied wrong information, and (ii) did so with the intention of defrauding, deceiving or misleading the agency. *Id.* at 977–78; *see also Jacobs v. Dep't of Justice,* 35 F.3d 1543, 1546 (Fed.Cir.1994); *Bradley v. Veterans Admin.,* 900 F.2d 233, 236 (Fed.Cir.1990); *Dennis v. Dep't of Health & Human Svs.,* 804 F.2d 670, 672 (Fed. Cir.1986); *Kumferman v. Dep't of Navy,* 785 F.2d 286, 290 (Fed.Cir.1986); *McIntire v. Fed. Emergency Mgmt. Agency,* 55 M.S.P.R. 578, 585–86 (1992). Because the DEA's burden of proof is by a preponderance of the evidence, our review is "whether the [Board] conclusion that the agency proved the charge against petitioner by a preponderance of the evidence is supported by substantial evidence." *Jacobs,* 35 F.3d at 1546 (quoting *Dixon v. Dep't of Transp.,* 8 F.3d 798 (Fed.Cir.1993)). In addition:

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Spurlock v. Dep't of Justice,* 894 F.2d 1328, 1330 (Fed.Cir.1990). If such an accounting so detracts from the weight of the evidence that supports the Board's decision, or "the agency's evidence is so sparse, that a reasonable fact finder would not find the charge proved by a preponderance of the evidence," *Dixon,* 8 F.3d at 804, the Board must be reversed.

*Id.* at 1546.

■ Neither the MSPB nor the AJ properly analyzed the *Naekel* test in its review of Mr. Haebe's case. The DEA "must prove all of the elements of the substantive offense with which an individual is charged." *King v. Nazelrod,* 43 F.3d 663, 666 (Fed.Cir.1994). The *Naekel* test applies here, but in a singular manner because under the policy Mr. Haebe was authorized to prepare a Report that provided less-than-complete, or even deceiving or misleading information, with respect to the CI. Thus, under the first part of the test, whether Mr. Haebe provided wrong information must be viewed from the perspective of the policy. Under the second part of the test, whether Mr. Haebe had the intent to defraud, deceive or mislead the agency collapses into whether he intended to go beyond the policy, that is, whether he intended to violate the policy. If his intent was to apply the policy but he blundered in doing so,[35] or if the contours of the policy were not sufficiently clear, *Naekel,* 782 F.2d at 979–80, 982, he would

---

**35.** For a false or fraudulent statement, specific intent can be inferred when the "alleged misrepresentation is made with reckless disregard for the truth." *McKenna v. INS,* No. 98–3366, 1999 WL 820417, 1999 U.S.App. LEXIS 25512, at *6 (Fed.Cir.1999) (per curiam) (quoting *Riggin v. Dep't of Health and Human Svs.,* 11 MSPB 331, 13 M.S.P.R. 50, 53 (1982)). Consequently, a "blunder," i.e., mere negligent disregard for the truth, would not be "reckless disregard" circumstantial evidence of intent.

not meet the intent prong of the *Naekel* test. *Id.* In our view, given the circumstances of this situation, the MSPB's decision that the agency proved that Mr. Haebe met the intent prong of the *Naekel* test by a preponderance of the evidence is not supported by substantial evidence.

In *Naekel,* the MSPB sustained the Federal Aviation Administration's ("FAA") decision to remove Mr. Naekel from his position for submitting two instances of allegedly false information in connection with an application for employment. *Naekel,* 782 F.2d at 976–77. This Court reversed, holding that there was no direct evidence of intent to deceive or mislead the FAA, and that the circumstantial evidence upon which the FAA attempted to derive intent inferentially was insufficient, even "woefully inadequate," to prove intent. *Id.* at 978–79. This Court found "the [B]oard's decision ... that the agency satisfied its evidentiary burden [to be unreasonable]." *Id.* The first instance of allegedly false information was Mr. Naekel's response on an employment application concerning whether he was fired from a fill-in job he held for one month, but which ended when he refused to follow a direct order to land a plane in bad weather, an action which in his estimation "might have cost someone their life." *Id.* This Court found that Mr. Naekel did not possess the requisite intent to deceive the FAA because (i) he reasonably believed that the temporary, fill-in job was not material to employment, (ii) after consulting legal counsel, he reasonably believed that being "fired" was not the proper way to characterize the event, and (iii) in earlier FAA applications he had characterized the removal from the job as being fired, and thus the FAA could not have been misled. *Id.* at 977–79. The second instance of allegedly false information was Mr. Naekel's response to whether he had ever resigned under threat of removal, where he had resigned from a job he intended to take in Chicago before he reported to work but after he completed some initial training. He resigned because the agency mishandled his travel expenses for an interview. This Court held that "by the time the proposed removal and resignation occurred, Naekel's employment by the agency had already ended." *Id.* at 980. Thus, this Court found that the agency had not proved intent to deceive because the circumstances surrounding the situation were ambiguous and did not support characterizing the resignation as anything other than how Mr. Naekel's characterized it: the employment ended because it was "mutually unsatisfactory." *Id.* at 980–82.

The DEA, like the FAA in its action against Mr. Naekel, brought insufficient circumstantial evidence to derive Mr. Haebe's intent inferentially. The DEA brought no direct evidence of Mr. Haebe's alleged intent to violate the policy. Indeed, the direct evidence submitted cuts the other way. Mr. Haebe testified directly that it was his intent to follow the policy in order to protect the identity of the CI. *Initial Decision* at 5. After hearing this testimony, the AJ acknowledged that Mr. Haebe's motivation for the ambiguous language was to protect the CI. *Id.* at 18. The circumstantial evidence the agency offers to derive intent inferentially is not, under any reasonable view, sufficient for the agency to prove intent under a preponderance of the evidence standard. Moreover, Mr. Haebe has a plausible explanation for his attempt to obfuscate the source of the information about the bag, *see McKenna v. INS,* No. 98–3366, 1999 WL 820417, 1999 U.S.App. LEXIS 25512, at *7 (Fed.Cir. October 13, 1999) (per curiam); *Jacobs,* 35 F.3d at 1548, because he testified that he did so in order to protect the identity of the CI and in reliance on the policy. The insufficiency of the agency's circumstantial evidence is evident from a

review of the several bases relied on by the MSPB in upholding the agency.

First, the MSPB notes that Mr. Haebe's statement was incorrect because it conveys the impression that he observed the bag when he did not. *Final Decision* at 182. Even assuming this finding to be supported,[36] it only goes to the first prong of the *Naekel* test. *Naekel,* 782 F.2d at 978 ("The fact of an incorrect response cannot control the question of intent."). As this Court stated in *Naekel:* "[w]ere a bare inaccuracy controlling on the question of intent, the 'intent' element of the charge would be subsumed within the distinct inquiry of whether the employee's answer adheres to the true state of facts." *Id.; see also Jacobs,* 35 F.3d at 1548; *Dennis,* 804 F.2d at 673. Thus, this first basis recited by the MSPB does not directly nor circumstantially support the agency's attempted proof of intent to mislead the agency by violating the policy. Mr. Haebe's situation is like that of Mr. Naekel, where the raw fact of the inaccuracy does not govern the intent prong of the *Naekel* test.

Second, the MSPB recites that Mr. Haebe admits that he intended to use deceptive language to conceal the existence of the CI. *Final Decision* at 182. This, however, is not direct or circumstantial evidence of intent to violate the policy because the policy allows him to conceal the existence of the CI. The MSPB attempts to qualify its reliance on this basis through the testimony of the second-level supervisor, while discarding as "irrelevant" the testimony of Mr. Haebe's immediate supervisor. *Id.* at 182–83. To evaluate Mr. Haebe's intent, however, the immediate supervisor's testimony cannot be so easily discarded. Taken together, in order to evaluate all of the circumstantial evidence as a whole as required by our case law, *Naekel,* 782 F.2d at 978; *Bradley,* 900 F.2d at 234, the supervisors' testimony shows that the contours of the policy were not definitive for the ambiguous language Mr. Haebe used.[37] The immediate supervisor would be primarily responsible for communicating the policy to Mr. Haebe. If the policy is not clear, then Mr. Haebe's alleged noncompliance is greatly diminished in import as circumstantial evidence from which to infer intent to violate the policy. The record does not show that the policy was codified or formalized; it seems to be a localism unique to the San Jose DEA office. The two supervisors disagreed as to how the policy applied to Mr. Haebe's statements.[38] Agents in the San

---

**36.** The AJ's findings on this point cut both ways. While the AJ and some witnesses interpreted the statement as conveying the impression ascribed to it by the MSPB, the AJ also found that the statement was not "unarguably false."

**37.** The AJ had to rely on his assessment of the credibility of the supervisors' testimony to accept the establishment of the San Jose office's policy to go to "great lengths to protect the identity of CIs" because an experienced inspector from the DEA's Office of Professional Responsibility testified that he had not heard of such a policy. *Initial Decision* at 5–6. Given that the policy was not known to the experienced inspector, and the import of the policy on the case, it seems likely that the AJ implicitly relied on the demeanor of the two

supervisors to assess whether such a policy existed. The testimony that the AJ heard convinced him that the San Jose DEA office had such a policy, and the MSPB did not take issue with the existence of such a policy.

**38.** Both the immediate and second-level supervisor testified before the AJ about the policy and whether they believed that Mr. Haebe's statements concerning the bag violated the policy. The supervisors disagreed on this point, thus in evaluating these conflicting supervisory viewpoints the AJ by necessity would have implicitly relied on his assessment of the demeanor of these witnesses to determine their credibility. Otherwise he would not have concluded that the policy was ambiguous.

Jose DEA office had some latitude to apply the policy.[39] Given the conflicting supervisor testimony, indicating an indistinct policy, Mr. Haebe's situation is akin to that of Mr. Naekel, where the form on which he was to report the fill-in job was not clear, *Naekel*, 782 F.2d at 979, and where the situation concerning the job in Chicago was ambiguous, *id.* at 982; *see also Bradley*, 900 F.2d at 238 (noting that meaning of supervisor's inquiry of employee was ambiguous); *McKenna*, No. 98–3366, at *8–9, 1999 WL 820417 (discussing whether to apply state or federal law to determine whether event was a felony and thus required to be reported on an employment application). Moreover, the MSPB and other courts have recognized in a variety of contexts that lack of clarity with respect to policy, procedure or the instructions given by a supervisor, can lead to insufficient proof on the issue of an employee's intent. *See Wise v. United States*, 221 Ct.Cl. 105, 603 F.2d 182, 188 (Ct.Cl.1979) (holding no intentional falsification of expense report records because in the absence of a specific internal requirement or regulation it was a judgment call as to whether an agent's spouse could be present at certain functions); *Asberry v. Dep't of Justice*, 62 M.S.P.R. 603, 607 (1994) (holding that a supervisory employee did not conduct an unauthorized investigation of an event because the agency's instructions to the employee concerning how to handle the event were ambiguous); *McIntire*, 55 M.S.P.R. at 586–87 (holding that agency did not prove intent for supervisor's falsification of time records for subordinate because under informal policy (i) recording incorrect information was a "routine and necessary" part of granting leave for the subordinate, (ii) supervisor reasonably believed that recording incorrect information was permissible, (iii) similar recording of incorrect information had

occurred in the past, and (iv) the supervisor reasonably did not have reason to know the subordinate at issue did not have accrued leave); *Young v. Dep't of the Navy*, 27 M.S.P.R. 274, 276 (1985) (reversing MSPB's affirmance of removal action because agency's leave policy was ambiguous and open to an interpretation that supported the employee's case, and because there was no evidence that the employee was told his requests for emergency leave would be disapproved); *Ruch v. Dep't of the Interior*, 18 M.S.P.R. 674, 676 (1984) (holding that management employee did not violate instructions in purchasing equipment because instructions were ambiguous and employee did not violate them by the way in which he interpreted them). Thus, this second basis recited by the MSPB, that Mr. Haebe intended to use deceptive language, does not provide circumstantial evidence to support the agency's attempted proof of intent.

Third, the MSPB states that Mr. Haebe was "well aware" of the second-level supervisor's policy, but also acknowledges that Mr. Haebe was not warned with respect to the particular ambiguous structure of language he used in the Report. *Final Decision* at 183. Although the record is clear that Mr. Haebe was generally aware of the policy allowing an agent to provide less-than-complete or misleading information to protect the identity of a CI, we find no support in the record for the MSPB's assertion that Mr. Haebe was specifically aware of the second-level supervisor's stipulation to the policy. The AJ's findings are arguably contrary to the MSPB's assertion because the AJ found that Mr. Haebe had not been warned about language that would violate the stipulation. Thus, in addition to relying on an assertion without demonstrated record support, the MSPB adopted two conflicting

---

**39.** Mr. Haebe's partner testified that the poli- cy was permissive. *Initial Decision* at 5.

views of the same factual point. As a result, this third basis of circumstantial evidence does not help the agency prove the intent prong of the *Naekel* test.

In sum, given the above-described problems with the sufficiency of the agency's circumstantial evidence to derive intent inferentially, a reasonable fact finder would not find that the agency has proven Mr. Haebe's intent to violate the policy by a preponderance of the evidence. Mr. Haebe testified directly as to his intent and had a plausible explanation for the ambiguous language. Given this opinion's reinstatement of the AJ's findings under specification two of charge one, motive is not circumstantial evidence in the agency's favor because, under the facts as found by the AJ that Mr. Haebe did go to the airport that morning and observed Mr. Alcala directly, Mr. Haebe had no motive to obfuscate his description of the bag other than to protect the CI. Thus, we reverse the decision of the MSPB with respect to specification three of charge one, and set aside the DEA's action because it was arbitrary, capricious, and unsupported by substantial evidence.

Finally, under both specifications of charge one, the AJ's analysis of the various credibility issues squarely meets the requirements of *Hillen* and *Spithaler*. In particular, the AJ carefully documented the required aspects of evaluating a witness as required by the MSPB in *Hillen*. The only aspect of *Spithaler* that is marginally lacking in the AJ's analysis is explanation of the authorities upon which his reasoning rests. However, to the extent this is error, it is harmless error here because the critical, material analysis is within the universe of facts surrounding the events of the morning of March 30, 1995.

## III. CONCLUSION

The finding of the MSPB that Mr. Haebe wrongly falsified statements on the Report is not supported by substantial evidence because the MSPB's reasons for substituting its own credibility determinations for that of the AJ are not sufficiently sound. In addition, the MSPB misapplied the intent element of the falsification charge. Therefore, we reverse.

*REVERSED.*

## COSTS

Costs to appellant.