**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**2017 MSPB 3**

Docket No. CB-1215-14-0012-T-1

**Special Counsel,**

**Petitioner,**

**v.**

**Katherine Coffman,**

**Respondent.**

January 6, 2017

Rachel A. Venier, Esquire, Mariama Liverpool, Esquire, and Clarissa
  Pinheiro, Esquire, Washington, D.C., for the petitioner.

Debra L. Roth, Esquire, Julia H. Perkins, Esquire, and Lisa A. Kleine,
  Esquire, Washington, D.C., for the respondent.

**BEFORE**

Susan Tsui Grundmann, Chairman
Mark A. Robbins, Member

## OPINION AND ORDER

¶1      The Special Counsel has filed a petition for review of the initial decision, which held that the Special Counsel did not prove the allegations set forth in its complaint seeking disciplinary action against the respondent. For the following reasons, we DENY the petition for review and AFFIRM the initial decision, finding no basis for disciplinary action in this case.

## BACKGROUND

¶2      The Special Counsel filed a complaint for disciplinary action against the respondent, the Deputy Assistant Commissioner for Human Resources

Management (HRM) at the U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS), in Washington, D.C., pursuant to 5 U.S.C. §§ 1214(a)(1)(A) and 1215(a)(1), which permit the investigation of prohibited personnel practices and the filing of this complaint with the Board. Initial Appeal File (IAF), Tab 1 at 4, 7.  The Special Counsel asserted that the respondent violated 5 U.S.C. § 2302(b)(1)(E)[1] and 5 U.S.C. § 2302(b)(6)[2] when she participated in the CBP's extensive efforts in 2010 to hire three candidates for career appointments who were favored by the recently appointed CBP Commissioner (the Commissioner).[3]  *Id.* at 5, 11-38.  The Special Counsel alleged that the respondent discriminated in favor of these individuals, who previously had been political appointees at DHS working with the Commissioner in his former role at DHS, by approving and certifying the results of three improperly manipulated competitive civil service packages with knowledge that the actions were intended to convert the noncareer political appointees to career appointments.  *Id.* at 5, 8.

¶3        The Special Counsel asserted that, after the Commissioner indicated his desire to hire the DHS employees in question, individuals within the CBP's Indianapolis Hiring Center (IHC) added criteria to the position descriptions and selective placement factors to the vacancy announcements for the Management and Program Analyst positions to closely match the experiences present in the DHS employees' résumés, changed one of the applicant's answers to the

---

[1] Section 2302(b)(1)(E) prohibits discriminating for or against an employee or applicant on the basis of marital status or political affiliation.

[2] Section 2302(b)(6) prohibits the granting of any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for the purpose of improving or injuring the prospects of any particular person for employment.

[3] The individuals involved in this case are referred to either by their initials, their position titles, or their roles in the case, rather than by their full names.  *See, e.g.*, *Graves v. Department of Veterans Affairs*, 123 M.S.P.R. 434, ¶ 3 (2016); *Ellis v. U.S. Postal Service*, 121 M.S.P.R. 570, ¶ 12 n.5 (2014).

qualifying questions to indicate that he possessed the minimum qualifications for the position, and found that another applicant had senior‑level knowledge and experience regarding certain issues despite having only 9 months of experience working on such issues. IAF, Tab 1 at 11, 14‑17, 26-30, 33‑35. The Special Counsel asserted that, after the selecting official (a political appointee in the Commissioner's office) selected the employees and the respondent approved the competitive civil service packages—certifying that the proposed actions met all merit and fitness requirements in 5 U.S.C. §§ 2301 and 2302 and forwarding the packages to DHS for approval and eventual consideration by the Office of Personnel Management (OPM)—the Chief Human Capital Officer at DHS, J.N., disallowed the competitive civil service appointments upon finding them improper. *Id.* at 9, 18-19, 30-32, 36-38.[4]

¶4        The Special Counsel also asserted that the respondent subsequently took away the Schedule A appointment authority of M.B., the CBP's Director of Executive Services, after M.B. expressed concern about converting one of the applicants (Applicant A) from a political to a career excepted-service employee using a special CBP noncompetitive Schedule A appointment authority limited to 10 positions involving oversight policy and directing sensitive law enforcement activities.[5] *Id.* at 9, 20-21; IAF, Tab 83, Exhibit (Ex.) 14. The Special Counsel alleged that the respondent assisted in preparing the Schedule A package, did not follow the CBP's internal operating procedures for filling excepted‑service

---

[4] In November 2009, OPM issued a written mandate, known as the "Berry Memo," requiring Federal agencies to obtain OPM approval before appointing a current or recent political appointee to a competitive or nonpolitical excepted‑service position under title 5 of the U.S. Code. IAF, Tab 83, Exhibit 12.

[5] At the outset, let us clarify that we are making a distinction in this case between the three competitive civil service appointments that J.N. *did not* approve, discussed above, and the one noncompetitive Schedule A appointment for Applicant A that J.N. *did* approve.

positions, participated in responding to OPM's questions about the conversion, and "helped draft, review and approve [an] embellished description of [Applicant A's] qualifications." IAF, Tab 1 at 21-25. Although J.N. approved this Schedule A conversion at DHS and forwarded it to OPM, OPM disallowed the appointment upon finding that Applicant A was not uniquely qualified for the position and that the appointment was not free of political influence and in compliance with merit system principles. *Id.* at 25-26.

¶5        Based on the above allegations, the Special Counsel filed a complaint with the Board against the respondent based on eight counts of: (1) violating 5 U.S.C. § 2302(b)(1)(E) – Political discrimination in the competitive selection of Applicant A; 5 C.F.R. §§ 4.2, 7.1, 720.901; (2) violating 5 U.S.C. § 2302(b)(6) - Unauthorized preference or advantage in the competitive selection of Applicant A; (3) violating 5 U.S.C. § 2302(b)(1)(E) – Political discrimination in Schedule A selection of Applicant A; Agency's Excepted Service Hiring Rule; (4) violating 5 U.S.C. § 2302(b)(6) – Unauthorized preference or advantage in Schedule A selection of Applicant A; (5) violating 5 U.S.C. § 2302(b)(1)(E) - Political discrimination in the competitive selection of a second applicant (Applicant B); 5 C.F.R. §§ 4.2, 7.1, 720.901; (6) violating 5 U.S.C. § 2302(b)(6) – Unauthorized preference or advantage in the competitive selection of Applicant B; (7) violating 5 U.S.C. § 2302(b)(1)(E) – Political discrimination in the competitive selection of a third applicant (Applicant C); 5 C.F.R. §§ 4.2, 7.1, 720.901; and (8) violating 5 U.S.C. § 2302(b)(6) – Unauthorized preference or advantage in the competitive selection of Applicant C. IAF, Tab 1 at 38-40.

¶6        After an extensive 6-day hearing, an administrative law judge (ALJ) assigned to this case found that the Special Counsel did not prove any of the counts in its complaint by preponderant evidence, and therefore imposed no discipline upon the respondent. IAF, Tab 95, Initial Decision (ID) at 5-6. The ALJ first found that the Special Counsel had the burden to prove that the respondent acted with intent. ID at 24-25. He also found that the respondent,

despite her arguments to the contrary, was a proper subject of the case because she had the authority to take, direct others to take, recommend, or approve personnel actions under 5 U.S.C. § 2302(b) and was an "appointing officer" under 5 C.F.R. §§ 7.1 and 720.901(a). ID at 25-26.

¶7 The ALJ noted that the focus of the Special Counsel's case against the respondent was based on (1) the respondent's April 23, 2010 and May 19, 2010 signatures on three cover letters forwarding to the Chief Human Capital Officer, J.N., the proposed competitive hiring actions of the three individuals at issue in this case, and (2) her role in a subsequent effort by the CBP's HRM to hire Applicant A using the Schedule A authority. ID at 26. The ALJ found as follows. The Commissioner instructed his Deputy Commissioner to arrange for the transfers of the three applicants and the Deputy Commissioner, in turn, communicated the Commissioner's wishes to the respondent's supervisor, the Assistant Commissioner for HRM, C.G., who reported directly to the Commissioner on all Human Resources (HR) matters. ID at 27. The Commissioner personally told C.G., but not the respondent, that he would like to bring the three applicants to the CBP as long as it was legal and ethical to do so. *Id.* C.G. then met with her direct report to begin the process, all of CBP's Schedule C political positions already were filled, the Commissioner's Deputy Chief of Staff testified that the selecting official repeatedly told him that the Commissioner wanted to hire the three applicants, and the two individuals in the CBP hierarchy who were principally involved in the discussions to hire them were C.G. and M.B., but not the respondent, who was not copied on or referenced in the email communications between the selecting official and C.G. ID at 28-29.

¶8 The ALJ held that the respondent had been appointed to her position only 7 months before the incidents in question and that the chain of events revealed that she "had no culpability whatsoever in the events described in the [Office of Special Counsel (OSC)] complaint." ID at 28. The ALJ noted that many of the witnesses called by the Special Counsel testified that the respondent was not

involved with either drafting the position descriptions or selective placement factors, or any other part of the hiring process of the three individuals in question, that all of the preparatory work for the application packages was completed in the IHC in Indianapolis, before the respondent reviewed them in Washington, D.C., that C.G. testified that she did not recall if she shared with the respondent the fact that the Commissioner wanted to hire these individuals, and that the three applicants all testified that they had no contact with or personal knowledge of the respondent concerning the CBP's efforts to hire them. ID at 29-30, 34-35. The ALJ found that the selecting official told a Management and Program Analyst within the CBP Commissioner's Office of Policy and Planning to obtain the résumés of the three individuals to create applications tailored to them for the purpose of appointing them. ID at 8 n.6, 30, 34-35.

¶9 The ALJ also found that the Special Counsel did not establish how the three competitive‑service application packages were physically created or assembled, where they were created or assembled and by whom, and did not associate the respondent with any material steps taken in that process. ID at 30-31. The ALJ noted that the Special Counsel's documentary evidence omitted the three complete, corporeal, and organized competitive‑service application packages as they existed on the dates the respondent signed and forwarded them to DHS for approval. ID at 31. He further found that an HR Specialist in IHC testified that she drafted and issued the vacancy announcements for the positions, determined the applicants' qualifications, and decided that two of the applicants were not qualified for the positions, but was told by her superiors—the IHC Director and Deputy Director—to find them qualified. ID at 31-32; IAF, Tab 1 at 8. The ALJ held that this HR Specialist testified that the selecting official personally wrote the selective placement factors included in the vacancy announcements, and that the respondent was not involved in creating them. ID at 32. The ALJ found that the IHC Director testified that the

applications and paperwork were manipulated by someone, probably the selecting official, that individuals within the Commissioner's office, including C.G.'s direct report, pushed IHC in Indianapolis to complete the packages, and that there was no evidence or testimony that any of that pressure came from the respondent. ID at 32-34.

¶10    The ALJ noted that, although the respondent signed the cover letters that forwarded the competitive-service application packages to DHS in Washington, D.C., "for" C.G., who was "oddly" absent from the office on both dates in question, the events surrounding the dates of the three letters "not only disprove Respondent's culpability, but rather suggest others within CBP engineered the hiring effort and then attempted to distance themselves from the three applications and to avoid personal involvement in the process." ID at 35-36. In this regard, the ALJ found that C.G., either personally or through others that did not include the respondent, engineered the three competitive application packages and Applicant A's Schedule A package while knowing that those documents had been manipulated to meet the Commissioner's objectives, and that C.G. "conveniently made herself absent on the days the forwarding letters were signed by Respondent." ID at 54‑55. Moreover, the ALJ found that the respondent testified that she was not familiar with the packages of Applicant B and Applicant C when they came to her for her signature, she had never seen them before that date and received no advance warning that they were coming (which was out of the norm), she returned the packages to the agency's Human Resources, Office of Policy and Planning (HROPP) to create a table of contents and arrange the documents in proper order because they were in "disarray," many individuals already had "signed off" on preparing the packages, she reviewed the packages with HROPP's former Staffing and Policy Director to ensure all of the documents required by the OPM checklist were included after she received the reorganized versions of the packages later that day, and did not read the individuals' résumés or the job descriptions included in the packages. ID

at 38–40. The ALJ found "highly credible" the respondent's testimony that she relied on the expertise of the subject matter experts who prepared the packages. ID at 40-41.

¶11    The ALJ also found credible the respondent's testimony that Applicant A's competitive application package, which arrived for her signature on a subsequent date when C.G., the respondent's supervisor, was on leave, contained a "couple hundred" pages, including the vacancy announcement, the position description, and a 1-page addendum concerning selective placement factors. ID at 41-42. The ALJ found that the respondent signed the package after reviewing it with the former Staffing and Policy Director using an appropriate checklist to ensure that the package was complete, and she did not read every page because it appeared to her that the IHC staffing specialists had completed their tasks and made the qualification determinations for the applicants. ID at 42.

¶12    The ALJ ultimately found that the Special Counsel did not produce any evidence showing that the respondent was motivated by any political factor when she signed the certifications accompanying the competitive-service application packages, or that the Commissioner wanted the three applicants transferred to the CBP because of their political affiliation. ID at 14-15, 43, 57-59. Rather, the ALJ found that the Commissioner wanted them transferred to the CBP because of their knowledge, skill, trustworthiness, and how they had performed for him previously at DHS. ID at 27, 59. The ALJ held that the Special Counsel did not produce any evidence that the respondent's having signed the certifications was an attempt to take or direct others to take, recommend, or approve any personnel action that discriminated for or against any employee or applicant for employment on the basis of political affiliation or that granted any unauthorized preference or advantage for the purpose of improving or injuring the prospects of any particular person for employment. ID at 43. In this regard, the ALJ noted that counsel for the Special Counsel had called the respondent as a witness to

support its case, stated during the hearing that it could not win its case without the respondent's potentially damaging testimony, and then devoted its post-hearing brief to impugning her credibility. *Id.*

¶13 The ALJ further held that, because the Special Counsel called the respondent as part of its case-in-chief, her statements had a direct bearing on whether the Special Counsel met its burden of proof. *Id.* He found that the respondent's testimony not only did not establish that she intentionally violated a statute or regulation, but actually disproved any such violation occurred because she "clearly established that she played no role, either directly or indirectly, in either the creation of the three vacancy announcements, position descriptions, résumés, and/or the competitive or Schedule A application packages," established her good faith reliance upon the professionals within HRM to complete work, and "refuted any notion that her actions in this case, albeit miniscule, had [anything] to do with either politics or a desire to grant an unlawful preference to anyone." ID at 43-44. In this regard, the ALJ agreed with the testimony of J.N., DHS's Chief Human Capital Officer—who oversaw all HR departments at DHS component agencies including the CBP—that it was reasonable for the respondent to rely upon subordinate HRM personnel to correctly assemble and present the three competitive‑service application packages for her review and signature. ID at 7, 44, 52. The ALJ found that C.G., either personally or through others exclusive of the respondent, "engineer[ed]" the application packages, and that, perhaps purposefully, the respondent was kept out of the loop until the last moment in all crucial communications related to processing these three application packages, when her signature was needed. ID at 52-56. The ALJ found the testimony of J.N., DHS's Chief Human Capital Officer, particularly credible based on his demeanor and his 33 years of Federal HR experience. ID at 52-53.

¶14 The ALJ noted that J.N. testified that he thought the three competitive application packages were a "joke." J.N. testified that the job descriptions and

selective placement factors had been modified on the same day, he believed this indicated that someone may have manipulated the paperwork to ensure that the three applicants were placed into the career track of the competitive service, and he felt two of the applicants were not qualified for the positions. ID at 44‑45. The ALJ found that J.N. testified that he then told C.G. and the respondent of his displeasure with the way the packages had been created, and that the respondent appeared "mortified" by the discussion, while C.G. did not seem upset in the least, suggesting that C.G. either orchestrated, or was well aware of, the manipulation, ID at 45‑46. The ALJ further held that J.N. testified that he was not surprised that C.G. was curiously absent on the dates the respondent signed the letters, he did not trust C.G., he did not believe the respondent was the "mastermind of this thing," and the respondent was not part of C.G.'s "team of people" who typically "did stuff like this." ID at 46. The ALJ found that, after the meeting with J.N., the respondent asked the former Staffing and Policy Director—who also had reviewed the packages—if she had had any concerns about them, and she responded that she did have concerns about Applicant B and his qualifications. ID at 55. The respondent then asked her "[w]hy didn't you tell me?" *Id.* The ALJ found that the former Staffing and Policy Director responded that she had raised her concerns with her supervisor who had overridden them, and that she did not inform the respondent of her concerns because she had followed her chain of command, which had "failed her." *Id.* The ALJ held that, by this supervisor being informed about such concerns, C.G. also was notified, because this supervisor was C.G.'s "direct report," all of which supported a finding that the respondent was kept "out of the loop" on all crucial communications regarding the processing of these packages. ID at 55-56.

¶15    Regarding the Schedule A hiring process for Applicant A, the ALJ found that M.B., the CBP's Director of Executive Services, received her guidance directly from C.G.; the respondent relayed to C.G. that M.B. refused to partake of

the Schedule A hiring process; the respondent was not referenced or included in subsequent discussions regarding using such authority to hire Applicant A; and the respondent did not participate in a conference convened by C.G. to discuss creating and processing Applicant A's Schedule A package, thus undermining the Special Counsel's assertion that the respondent "participated in a scheme involving multiple government employees at various levels of an agency." ID at 36-38, 44. The ALJ held that there was no indication that the respondent was materially involved, or even significantly referenced, in the Schedule A discussions among C.G. and the HRM staff. ID at 47. The ALJ noted that, although the respondent signed the memorandum transferring M.B.'s Schedule A appointing authority to the HROPP, which coincided with M.B.'s refusal to process Applicant A's Schedule A application, it was the decision of C.G., the respondent's supervisor, to do so, and this was consistent with Chief Human Capital Officer J.N.'s testimony that the respondent was "a bit timid and not real assertive and not a big player in the operation." ID at 47-48; Hearing Transcript (HT), Volume (Vol.) 4 at 215. The ALJ further found that the Special Counsel overstated the respondent's involvement with processing Applicant A's Schedule A application when it suggested that she reviewed and edited various drafts of the package because her role was limited to ministerial and informational actions with staff, such as advising them not to include attachments in emails to C.G. and asking them to review the package for format and grammar. ID at 48. The ALJ found that there was no evidence suggesting that the respondent engaged in any activity proscribed by statute or regulation, and that C.G., not the respondent, signed Applicant A's Schedule A application and forwarded it to J.N. ID at 48-49.

¶16    Regarding each of the eight counts in the complaint, therefore, the ALJ found that the Special Counsel failed to prove that the respondent acted intentionally to commit some improper or unauthorized personnel action on the basis of political affiliation or for the purpose of improving the prospects of the

applicants. ID at 49-70. The ALJ noted that the only evidence of the respondent's personal involvement with any of the packages was her having signed the competitive package cover letters for her supervisor, C.G., and that there was no probative evidence that she physically constructed or manipulated the position descriptions, vacancy announcements, or application packages, gave orders to do so, or was personally involved in any aspect of planning, executing, or creating those documents. ID at 49-50. The ALJ noted that, because the Special Counsel did not offer into evidence the corporeal, complete, competitive application packages as they were presented to the respondent on the relevant dates, the Special Counsel failed to support its assertion that the respondent reviewed files that contained obvious evidence of favoritism. ID at 51-52. The ALJ also noted that no one testified that the respondent was aware of, let alone motivated to act in the applicants' favor based on, their political affiliation. ID at 61, 64, 66. Thus, the ALJ concluded that the Special Counsel "errantly conflates Respondent's ministerial action of signing HRM staff work with an improper intent," and that her signatures on the documents simply did not prove what the Special Counsel alleged. ID at 51.

¶17    The ALJ noted that, assuming that the respondent should have undertaken a more detailed review of the competitive application packages before signing them, the Special Counsel had proven, at most, that the respondent was negligent in her duties, not that she acted intentionally to advance the applications for improper reasons. ID at 61, 65-68. The ALJ concluded that the Special Counsel's case relied entirely on conjecture and speculation that the respondent participated in, or "knew or should have known" of, the events in question, which actually were directed and accomplished by persons other than the respondent who were "apparently beyond the reach of [OSC] or the Board's jurisdiction." ID at 68. Thus, the ALJ found himself "left with the unmistakable impression that Respondent was charged solely because she was the last woman standing," and that the evidence and testimony supported no other conclusion. *Id*.

<u>ANALYSIS</u>

¶18      On review, the Special Counsel asserts that the respondent granted unlawful hiring preferences in violation of 5 U.S.C. § 2302(b)(6).[6] Petition for Review (PFR) File, Tab 6 at 1. In this regard, the Special Counsel contends that the respondent knew, when she certified that the three competitive appointments complied with OPM rules, that "the competitive examinations were devised to convert three political appointees to career status to satisfy the request of CBP's new Commissioner." *Id.* The Special Counsel also contends that the respondent subsequently "advanced [Applicant A's] employment prospects" for a career appointment under Schedule A of the excepted service, knowing that the Schedule A hiring action was intended solely to hire the favored candidate. *Id.* at 2.

¶19      Section 2302(b)(6) of title 5 states:

> Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority . . . grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of

---

[6] The Special Counsel indicates that it is incorporating its post-hearing brief by reference and that its petition for review focuses only on counts 2, 4, 6, and 8 of the complaint, which allege violations of 5 U.S.C. § 2302(b)(6). Petition for Review (PFR) File, Tab 6 at 1 n.1. The Special Counsel does not otherwise challenge the initial decision's finding that it did not prove counts 1, 3, 5, and 7 of the complaint, which allege that the respondent violated 5 U.S.C. § 2302(b)(1)(E) by discriminating for an employee or applicant for employment on the basis of political affiliation.

The Board normally will consider only issues raised in a timely filed petition or cross petition for review. 5 C.F.R. § 1201.115. Attempts to incorporate briefs that were filed below are insufficient to meet the Board's standards, and a petition for review must identify any procedural or adjudicatory errors and explain how they affected the outcome of the initial decision. *Hulett v. Department of the Navy*, 120 M.S.P.R. 54, ¶ 5 n.2 (2013). Under these circumstances, we find no basis for overturning the ALJ's findings regarding counts 1, 3, 5, and 7.

improving or injuring the prospects of any particular person for employment . . . .

5 U.S.C. § 2302(b)(6).

¶20    To establish a violation of 5 U.S.C. § 2302(b)(6), the Board requires that the Special Counsel establish an intentional or purposeful taking of a personnel action in such a way as to give a preference to a particular individual for the purposes of improving his prospects. *Special Counsel v. Byrd*, 59 M.S.P.R. 561, 570 (1993), *aff'd*, 39 F.3d 1196 (Fed. Cir. 1994) (Table). This standard is consistent with the plain text of the statute, which specifies that the preference must be given "for the purpose of" providing the improper advantage. 5 U.S.C. § 2302(b)(6). Thus, whether the respondent violated 5 U.S.C. § 2302(b)(6) turns on whether she *intended* to afford preferential treatment to the three applicants in question. *See Byrd*, 59 M.S.P.R. at 590. It is not the respondent's actions themselves that violate the law, but instead, the intent behind those actions. *Id*. The Special Counsel bears the burden of proving that the respondent has violated section 2302(b)(6) by preponderant evidence. *See Special Counsel v. Cummings*, 20 M.S.P.R. 625, 632 (1984); 5 C.F.R. § 1201.56(a)(1)(ii).

¶21    At the outset, we state up front that, while the respondent's actions amounted to possible error or negligence, we find that they did not rise to the level of intentionally committing an unlawful hiring practice. Likewise, our decision in this matter does not resolve whether illegal hiring practices did or did not happen. They may have, but the Special Counsel failed to prove that the respondent's actions showed that she intentionally granted an unlawful hiring preference in violation of 5 U.S.C. § 2302(b)(6).[7] We now explore the specific reasons in support of these findings.

---

[7] According to the ALJ, a former co-respondent in this case, who was charged with committing prohibited personnel practices, ultimately entered into a settlement agreement with OSC. ID at 33. This individual, at the Board hearing, testified that she never had any communication, directly or indirectly, with the respondent, or that the

<u>The respondent's statements in her pre-appeal interviews with the Special Counsel do not establish that she intentionally committed an unlawful hiring practice.</u>

¶22    The Special Counsel asserts that the respondent knew when she certified the competitive appointments that the Office of Human Resources Management "had used these appointments specifically to hire [the Commissioner's] political team." PFR File, Tab 6 at 7. To support this assertion, the Special Counsel cites to testimony the respondent provided under oath during two pre‑appeal interviews with the Special Counsel. *Id.* at 8-9. The Special Counsel contends that, because the respondent testified at the hearing that she did not know of the "improper purpose" of the hiring actions, a conflict in the evidence existed that the ALJ failed to resolve. *Id.* at 15. The Special Counsel also asserts that the ALJ improperly discounted these alleged prior conflicting statements upon finding that the respondent's statements during the pre-appeal interviews were made without the benefit of discovery and counsel. *Id.* at 16.

¶23    More specifically, the Special Counsel asserts that the respondent knew in April 2010 of the CBP's plan to hire political appointees into career positions because she admitted during the pre-appeal interviews about knowing of her office's attempt to hire the Commissioner's favored candidates. *Id.* at 8. The record citations the Special Counsel identifies do not, however, support a finding that the respondent intended to afford preferential treatment to the candidates in question. During the interviews, the respondent testified that she first learned Applicant A's name in April 2010 "when the organization was trying to hire him," C.G. was working with the "front office" on hiring him, she tracked the hiring process on the rare occasions when C.G. was out of the office, and she "otherwise . . . had little . . . involvement." IAF, Tab 86, Ex. 133 at 23-24. The

respondent "was involved in any way in the handling of the three competitive applications at issue." ID at 33‑34.

respondent did not testify that she knew that others had granted an unauthorized preference or that she was doing so when she signed the certifications. In fact, contrary to the Special Counsel's contention that the respondent knew that the Commissioner favored the candidates, the respondent testified that she knew that the selecting official was interested in hiring Applicant A, but was not aware of anyone else who wanted to hire him, including the Commissioner. *Id*. at 25-27.

¶24    The Special Counsel also contends that the respondent admitted during the pre-appeal interviews that C.G. mentioned hiring the three applicants through vacancy announcements, and that the respondent knew "in the April time frame" that C.G. was working with the "front office" on hiring Applicant A. PFR File, Tab 6 at 17. The respondent actually testified, however, that she "probably" first learned Applicant A's name "in the April time frame" in the context of keeping track during C.G.'s absence of what was going on regarding hiring Applicant A. IAF, Tab 86, Ex. 133 at 23-24. In any event, much of the purported conflicting testimony the Special Counsel identifies on review relates to when the respondent learned the names of the three applicants at issue here. We find that any discrepancies in either the dates of such knowledge or who was interested in hiring any of the three candidates does not show that the respondent was aware of any unauthorized preference or advantage that had been provided in the application process or that she herself intended to give an unauthorized preference or advantage when she certified that the personnel actions complied with OPM's requirements.

¶25    The Special Counsel also identifies the respondent's testimony during her pre-appeal interviews indicating that she heard Applicant A's name in April 2010 in connection with the names of Applicants B and C regarding "merit promotion announcements and could we reach them through vacancy announcements" or a competitive process. PFR File, Tab 6 at 34-35. This testimony could be construed to conflict with the respondent's hearing testimony that, when she first received Applicant B's competitive application package, she "had no idea what

the . . . request was about, why it was coming in for signature," was not familiar with the package, and had the former Staffing and Policy Director explain to her that Applicant B was a political appointee who had applied for the position through a vacancy announcement handled by the IHC. HT, Vol. 4 at 60, 66. However, the respondent's hearing testimony must be placed in the context of her having received Applicants B's and C's packages in such a state of "disarray" that she returned them to be placed in the proper order with a table of contents. *Id.* at 60, 65. Moreover, this reference in the pre‑appeal interviews to her recognizing certain names in connection with hiring through a competitive process does not establish that the respondent knew when she signed the certifications that she was granting an unauthorized preference, i.e., that there was an "improper purpose" to her actions. In fact, the respondent's testimony during the pre-appeal interview reflects that, when she signed the certifications for Applicants B and C, she was not aware that there were selective placement factors associated with the positions in question. *Id.* at 118‑20. She also testified that, when reviewing Applicant A's competitive application package, she did not remember seeing that the IHC had changed Applicant A's response to a question regarding whether he met the minimum qualifications for the position. *Id.* at 179-80; HT, Vol. 4 at 90-91. The respondent further testified that she did not know, when she certified the competitive packages, that the HROPP had received the applicants' résumés before it drafted the vacancy announcements. HT, Vol. 4 at 115. Thus, even fully considering the pre-appeal interview testimony that the ALJ found was outweighed by the respondent's hearing testimony, ID at 59‑60, it does not warrant a different outcome in this case.

The respondent's questions about possibly using an excepted‑service appointment under Schedule A do not establish that she later intentionally committed an unlawful hiring practice.

¶26     The Special Counsel contends that the respondent testified during her pre‑appeal interviews that C.G. asked her to check with M.B., CBP's Director of

Executive Services, to determine if the CBP could use an excepted‑service appointment under Schedule A to hire Applicant A and whether the new OPM rules on political conversions applied to Schedule A. PFR File, Tab 6 at 9. The Special Counsel also asserts that the respondent admitted that she contacted M.B. to "find out what is the authority, how do we use it, how many people have been currently appointed under that authority, that kind of thing." *Id.*; IAF, Tab 86, Ex. 133 at 37. The respondent's attempt to learn more about the Schedule A authority does not, however, establish that she later acted with an intent to grant an unauthorized preference as to that authority. In fact, the respondent testified that the CBP's Schedule A hiring authority was unique and "new to me," and M.B. was very helpful in providing the respondent with information regarding the process and the number of Schedule A openings. IAF, Tab 86, Ex. 133 at 37-38.

¶27     The respondent testified that M.B. ultimately told her that she did not think that OPM would approve using the Schedule A hiring authority because the CBP previously had tried to hire Applicant A under a merit promotion announcement, and she may have told the respondent that it created the appearance of a prohibited personnel practice. *Id.* at 38-40. The Special Counsel notes that M.B. testified at the Board hearing that she informed the respondent that she would no longer be a part of the Schedule A hiring action for Applicant A because of the political "burrowing in" issue, which M.B. believed could lead to an investigation. PFR File, Tab 6 at 10; HT, Vol. 2 at 26-28.

¶28     We agree with the ALJ that M.B.'s objections as expressed to the respondent related to the CBP's using the Schedule A hiring authority for Applicant A, not to the competitive‑hiring process. ID at 37; IAF, Tab 83, Ex. 9; HT, Vol. 1 at 214. Thus, the referenced discussions the respondent had with M.B. fail to show that the respondent intentionally granted an unauthorized preference when she certified Applicant A's competitive application.

¶29 M.B. expressed her concerns to the respondent regarding the Schedule A hiring process for Applicant A. Yet, other individuals within the CBP and DHS, including Chief Human Capital Officer J.N., disagreed with OPM's ultimate decision to deny DHS's request to convert Applicant A, based on OPM's finding that the agency did not follow its own operating procedures when making such an appointment, and that Applicant A was not "uniquely" qualified for the position, but was at best minimally qualified. IAF, Tab 84, Ex. 115; HT, Vol. 4 at 200-01. J.N. testified that he believed using the Schedule A hiring process was appropriate for the conversion because Applicant A did not need to be "uniquely" qualified for the position, but only qualified, the wording of the CBP's procedures indicated that public notice was not required, soliciting résumés "may" be used but was not required as OPM found, and the procedures themselves could be waived with prior approval by C.G., the Assistant Commissioner of HRM. HT, Vol. 4 at 200‑05. Even M.B. disagreed with OPM's determination that the agency did not follow its own operating procedures when seeking Applicant A's appointment using the Schedule A authority, testifying that the agency never used any written policy when filling Schedule A positions, 5 C.F.R. part 302 did not apply to the CBP's hiring for those positions, and there were no such requirements for filling the 10 Schedule A positions.

¶30 We thus agree with the ALJ that, given this difference of professional opinion between OPM and DHS as to the propriety of using the Schedule A authority to hire Applicant A, the Special Counsel has not shown under the circumstances of this case that the concern, by itself, that M.B. expressed to the respondent establishes by preponderant evidence that the respondent subsequently acted with an intent to provide an unauthorized preference to Applicant A as to any of her actions in this case. ID at 57. In any event, the ALJ found that the respondent's actions to hire Applicant A were merely ministerial and informational, ID at 48, and, as set forth more fully below, the Special Counsel has not shown that the ALJ erred in that regard.

<u>Even assuming that the respondent was kept "in the loop" about matters pertaining to the three applicants, this does not prove that she intentionally committed an unlawful hiring practice.</u>

¶31      The Special Counsel contends that C.G. testified at the Board hearing that she kept the respondent "in the loop" on the hiring actions for the three applicants. PFR File, Tab 6 at 11. In fact, some of the testimony indicates that C.G. sent the respondent a courtesy copy of a May 18, 2010 email she had sent to the then-acting Director of Hiring, about creating a process or checklist to ensure that CBP sent the correct documents to DHS whenever a political appointee was selected for a competitive-service position because "I tried to keep her in the loop on everything I could." HT, Vol. 5 at 238-40; IAF, Tab 83, Ex. 49. Likewise, C.G. testified that, when M.B. was working on Applicant A's Schedule A appointment authority and Applicant B's and C's competitive packages were being handled, the respondent was "in the loop." HT, Vol. 5 at 247. The Special Counsel further notes that C.G. testified about informing the respondent of the Commissioner's interest in the three applicants. PFR File, Tab 6 at 11; HT, Vol. 5 at 274-76.

¶32      Even assuming the truth of this testimony, however, we find that it merely shows that C.G. tried to keep the respondent generally aware that others were working on packages involving individuals of interest to the Commissioner. It does not show that the respondent was told any details about the processing of those packages, such as whether others had provided those employees with unauthorized preferences. In fact, even assuming that the respondent knew from C.G. or somebody else that the three applicants at issue were political appointees at DHS, such knowledge alone would not demonstrate that she or the agency were trying to provide them with an unlawful preference or advantage. In this regard, we note that OPM's "Berry Memo" states that, while political appointees must not be given preference or special advantages, they may not be excluded from consideration for Federal jobs because of their political affiliation. IAF,

Tab 83, Ex. 12. Thus, we find that the evidence provided that the respondent was kept "in the loop" does not prove by preponderant evidence that she herself acted with the intent to grant an unauthorized preference or advantage.

<u>The respondent's role in the HR office, her receipt of certain emails, and her behavior after the DHS rejected the hiring actions do not demonstrate that she intentionally committed an unlawful hiring practice.</u>

¶33    The Special Counsel asserts that emails the respondent received, her role as the Deputy Assistant Commissioner, and her behavior after DHS rejected the competitive selections all show that she knew of the improper purpose of the hiring actions. PFR File, Tab 6 at 13-15. The emails in question, however, merely indicate an update on the hiring actions, that the Commissioner was interested in a given candidate, and that the respondent "thought" that Applicant A's competitive application package was a priority. They do not reveal any information to establish, for example, that selective placement factors had been added to match the applicants' experience or that the IHC staff processing the applications had deemed Applicant A as qualified despite his contrary responses to the qualifying questions. *See, e.g.*, IAF, Tab 83, Exs. 40, 49, Tab 84, Ex. 81. Thus, the respondent's receipt of these emails does not provide a basis for finding that she intended to afford preferential treatment.

¶34    Next, the Special Counsel contends that the evidence shows that the respondent was a Senior Executive Service (SES) official and C.G.'s full deputy and "alter ego." PFR File, Tab 6 at 14. Nonetheless, these facts again do not demonstrate an intent to provide preferential treatment. The Special Counsel contends further that the respondent's improper purpose for the appointments is evidenced by her admission that, after DHS rejected the CBP's selection of the three applicants at issue, she did not consider filling the jobs with other applicants on the certification list. *Id.* at 15; IAF, Tab 86, Ex. 133 at 126-27. However, there is no dispute that the respondent was not the selecting official for any of these candidates. HT, Vol. 3 at 56; IAF, Tab 83, Ex. 28, Tab 84, Exs. 58,

74. Thus, the Special Counsel has not established that the respondent was in a position to select or not select any or all of the applicants.

¶35    In fact, we find that the respondent's reaction during the meeting with Chief Human Capital Officer J.N. and HRM Assistant Commissioner C.G., when J.N. informed them of his strong disapproval of the competitive appointments, shows that she did not know of the improper purpose when she signed the certifications.    The respondent testified during her pre-appeal interviews that J.N.:

> specifically stated he didn't think either candidate was highly qualified or even barely, minimally qualified for the jobs . . . . He mentioned the selective placement factors . . . that [were] included in both of the announcements. Then he mentioned at that time that both of these individuals were on Schedule C appointments. They were working at the department for [the Commissioner]. I can tell you at that time, at that meeting, my head was on fire, I physically and mentally felt like I was melting in the chair. Because prior to that meeting, I did not realize that [Applicant B] and [Applicant C] had worked for [the Commissioner] when [he] was at the department. And I didn't really—I was so embarrassed sitting there at the table because I did not look at those quality rank—excuse me, selective placement factors in those announcements. And when he was—when [J.N.] was talking about their qualifications, I was professionally embarrassed sitting at that table because I did not go through those packages with due diligence, I didn't . . . I really didn't pay any attention when I signed those packages in April, where they were employed.

IAF, Tab 86, Ex. 133 at 121-22.

¶36    The respondent further testified:

> But I just know that when I was at that table, I physically felt hot and embarrassed, and I just was—so, he asked who approved those packages, and I told him I had.  And he asked me if I felt any pressure from any individual . . . .  I told him "no."  I told him that I did not do due diligence looking at those packages.  And to find out, sitting there at the table that he had gone through those packages so thoroughly that, looking at what he did is what I should have done, and that's what I told him.  He was doing the job that I should have [done] on those packages.  It never should have made it up there.

*Id.* at 122. The respondent added:

> I was so embarrassed that these packages were sitting there with my signature on them. One, I should not have signed them without my boss looking at them. And second, because he went through them in such detail and I had signed it, I professionally was embarrassed. And . . . that I kept thinking about that the whole [time], I was so distracted with that, I felt six inches tall. You know, I'm new SES, been there since September, here it is, and now it's June and I signed them in April.

*Id.* at 128. She testified that, if she had done "due diligence" on the packages, then she would have come to the same conclusion as J.N. *Id.* at 138-39.[8] The respondent's testimony regarding her reaction at the meeting with J.N. and C.G. is consistent with J.N.'s testimony that, after he told C.G. and the respondent of his displeasure with the way the packages had been created and manipulated, the respondent appeared "mortified" and upset, while C.G. did not appear fazed in the least. HT, Vol. 4 at 175-76.

The alleged conflicting testimonial and documentary evidence regarding the respondent's knowledge fails to show that she intentionally committed an unlawful hiring practice.

¶37    The Special Counsel contends that the ALJ did not resolve a "clear conflict" between the respondent's hearing testimony denying knowledge of the purpose of the hiring actions and evidence to the contrary. PFR File, Tab 6 at 15. Specifically, the Special Counsel argues that the respondent's hearing testimony that the names of the three applicants meant nothing to her, she was not aware on May 18, 2010, of the Commissioner's interest in Applicant A's appointment, she did not know who Applicant A was when she signed off on the package for his

---

[8] The respondent testified in a similar manner during the Special Counsel interviews regarding Applicant A's competitive application package, stating that she reviewed the package as she did the other two, "not looking again at the qualifications, at the vacancy announcement, and just looking, just basically going through it in a light read," and that she did a cursory review and did not notice that Applicant A had rated himself as ineligible, which was overridden by the IHC. IAF, Tab 86, Ex. 133 at 177‑78, 180.

competitive appointment, she was unaware that Applicants B and C had been recruited when she reviewed their hiring packages, and she was not aware of the Commissioner's interest in hiring Applicant B, conflicted with evidence that she had seen those names in emails days before she certified Applicants B's and C's appointments. *Id.* at 16‑17. The Special Counsel asserts that this testimony conflicts with the CBP's Director of Executive Services M.B.'s testimony that "we" were aware that Applicant A worked for the Commissioner, that "we all knew" in discussing the Schedule A recruiting authority that the Commissioner was interested in hiring Applicant A, and that she told the respondent before Applicant A's competitive appointment that she would no longer work on his Schedule A package because of concerns about political "burrowing in." *Id.*; HT, Vol. 2 at 27-28.

¶38    However, M.B.'s testimony that "we" knew that Applicant A had worked for the Commissioner was in response to a question regarding C.G.'s (rather than the respondent's) involvement, and thus does not suggest that the respondent also knew that information. HT, Vol. 1 at 224-25. M.B.'s testimony that "we all knew" of the Commissioner's interest in hiring Applicant A appears to be based solely on M.B.'s belief that C.G. and the respondent "were involved in this," without identifying any other basis for her belief, such as directly observing the respondent receiving information that the Commissioner wanted to hire Applicant A. *See Spurlock v. Department of Justice*, 894 F.2d 1328, 1330 (Fed. Cir. 1990) (finding that imprecision detracts from the weight to be accorded evidence). This testimony does not, therefore, overcome the respondent's specific denial in this regard. In addition, M.B. testified that she briefed the respondent on her discussions with a DHS official regarding using the Schedule A law enforcement authority to hire Applicant A "during this April‑May 2010 timeframe." HT, Vol. 2 at 23-24. Notably, though, M.B. did not indicate that such a briefing occurred before the respondent certified

Applicant A's competitive package on May 19, 2010. IAF, Tab 90, Ex. LL. Because M.B.'s testimony only addresses Applicant A, it does not contradict the respondent's testimony regarding the other two applicants at issue.

¶39    The Special Counsel also relies upon two emails the respondent received and sent on May 18 and May 19, 2010, respectively, that it claims show that Applicant A's appointment was a "high interest item" for the Commissioner. PFR File, Tab 6 at 17. In the May 18 email, a courtesy copy of which was sent to the respondent, C.G. asked the acting Director of Hiring to check on the status of Applicant A's package, and stated that the Commissioner was "particularly interested in this one." IAF, Tab 83, Ex. 49. In the May 19 email, the respondent informed C.G. that she missed a DHS meeting to work on Applicant A's package because she "thought it best to keep some of these high interest items moving." IAF, Tab 84, Ex. 81. The Special Counsel further references an April 19, 2010 email the respondent received as a courtesy copy that provided an update on the status of hiring the three applicants at issue. PFR File, Tab 6 at 17‑18; IAF, Tab 83, Ex. 40.

¶40    The respondent testified at the hearing that she "just glanced through" the May 18, 2010 email on her Blackberry while she was on leave for the afternoon, and did not give it much significance or pay much attention to it then because she was packing for a long trip, getting her car fixed, and visiting a health care provider. HT, Vol. 5 at 73-75. She testified that she did not know who Applicant A was at that time, and there was nothing in the May 18, 2010 email indicating that he was a Schedule C political appointee. *Id.* at 76. Regarding the other emails identified by the Special Counsel, we again find that the level of the respondent's familiarity with Applicant A's name and knowledge of who was interested in hiring him, and whether any of these hires were of a "high interest" to the Commissioner, do not show that the respondent acted with the intent to grant an unauthorized preference or advantage when she signed the certification letters on behalf of C.G. in C.G.'s absence.

¶41     The Special Counsel further relies upon C.G.'s testimony that she "would have" conveyed the Commissioner's interest in the three applicants to the respondent and the rest of the staff, that the respondent knew, when she certified the three competitive application packages, that the political appointees were of interest to the Commissioner, and that the respondent was "in the loop" on the political conversion packages. PFR File, Tab 6 at 17-18. As set forth above, *see supra ¶ 32*, this testimony regarding what C.G. "would have" done or believed the respondent knew, regarding whether the applicants were "of interest" to the Commissioner, does not show by preponderant evidence that the respondent intended to grant an unauthorized hiring preference or advantage. Consequently, we find that the Special Counsel has not shown that any discrepancies or conflicts in the documentary evidence or the respondent's testimony affect our ultimate determination that the Special Counsel has not proven its charges.

<u>Although the respondent may have been negligent and/or motivated to please her new manager, that is insufficient to establish that she reviewed files that contained obvious evidence of favoritism or that she intentionally committed an unlawful hiring practice.</u>

¶42     The Special Counsel contends that "[e]vident manipulation of the hiring process contained in the hiring packages Respondent certified further demonstrates her culpability." PFR File, Tab 6 at 18. In particular, the Special Counsel contends that the packages the respondent reviewed included obvious evidence of noncompliance with OPM directives and improper IHC actions, such as tailoring position requirements to the favored candidates' experiences and the qualification of two favored candidates who lacked minimum qualifying experience. *Id.* at 18-19. The Special Counsel asserts that the respondent's disregard for the evidence of manipulation provided the candidates with unauthorized advantages, and that the ALJ erred in crediting the respondent's claim that she conducted only a cursory review of the packages she certified. *Id.* at 20-21. In this regard, the Special Counsel notes that the respondent had over 20 years of experience in HR, understood her duty and accountability as a

certifying official, had an opportunity to discover the hiring process manipulation, provided no reasonable explanation for her conduct or corroboration for her testimony, and had a motive to please the new Commissioner. *Id.* at 21-24.

¶43 Although the respondent testified that by September 2011, she had 24 years of HR experience, she also testified that this was the first time she had worked on converting a Schedule C employee to a career appointment, given that she had not dealt with political appointees in her prior employment. IAF, Tab 86, Ex. 133 at 17-18, 158. In fact, this was the first time the CBP and DHS had processed political conversion actions since the issuance of the Berry Memo in November 2009. HT, Vol. 4 at 61-62. As the ALJ noted, the respondent had joined the CBP only 7 or 8 months before the certifications at issue, ID at 28; HT, Vol. 4 at 37-38, and the Deputy Assistant Commissioner position was her first SES position, IAF, Tab 86, Ex. 133 at 15-16, 158. Moreover, the fact that the respondent testified that she understood the general principles behind the Berry Memo, HT, Vol. 4 at 52‑57, does not necessarily contradict her testimony that she did not perform due diligence as to her review of the packages in question.

¶44 Moreover, there is corroboration for the respondent's testimony that she conducted cursory reviews and failed to note the manipulation of the application packages. C.G. testified that the respondent took responsibility for the competitive application packages during the meeting she had with J.N. when he disapproved them, and afterward told C.G. that she mistakenly failed to go over the packages in more detail before sending them to DHS. HT, Vol. 5 at 270-71. C.G. also testified that she did not recall if, before she left for her vacation, she gave the respondent any specific instructions regarding what to do with the packages when they were transferred from the IHC to headquarters. *Id.* at 216‑20. The Special Counsel has provided no evidentiary support that the respondent was motivated to please the Commissioner when she signed the

certifications for the applicants in question. PFR File, Tab 6 at 24. In any event, even if the respondent were anxious to please the new Commissioner, it does not necessarily follow that she acted illegally here. Likewise, it appears that the respondent may have been negligent in the performance of her duties. But negligence alone is insufficient to establish that she intentionally committed an unlawful hiring practice. In addition, the Special Counsel has shown no error in the ALJ's determination that the record does not include a complete copy of the packages as they existed when the respondent certified them and forwarded them to DHS. ID at 31, 51, 61, 64, 66. Thus, the ALJ properly concluded that the Special Counsel failed to prove by preponderant evidence that the respondent reviewed files that contained obvious evidence of favoritism. ID at 51-52.

<u>The respondent's actions concerning the processing of one of the applicant's appointment under Schedule A authority fails to demonstrate that she intentionally committed an unlawful hiring practice.</u>

¶45        The Special Counsel also contends that the respondent knew that the Schedule A position was intended for only one favored candidate and granted an unlawful hiring preference when she helped Applicant A obtain that position. PFR File, Tab 6 at 25. In this regard, the Special Counsel disagrees with the ALJ's determination that the respondent's role in the Schedule A appointment process was only informational, ministerial, and "almost non-existent," asserting that her role was substantive and necessary and included transferring Schedule A appointment authority away from the CBP's Director of Executive Services M.B., who opposed using that authority because she believed it constituted an improper attempt to "burrow[] in" a political appointee. *Id.* at 10, 25-27.

¶46        As the ALJ found, however, it was C.G. who decided to remove M.B.'s Schedule A authority, and who directed the respondent to draft the letter effecting the change. ID at 47-48; IAF, Tab 86, Ex. 133 at 44, 87, Tab 93, Ex. DDDD. Thus, we agree with the ALJ's characterization of the respondent's actions in this

regard, and find that they do not show that she acted with an intent to provide an unauthorized preference or advantage.

¶47    The Special Counsel also contends that the respondent thereafter prepared, with her staff's help, the cover letter asking for Applicant A's appointment under Schedule A, as well as the memorandum containing the agency's justification for the appointment, making several revisions to the memorandum to bolster the applicant's candidacy. PFR File, Tab 6 at 27. The Special Counsel asserts that the respondent discussed presentation strategies with C.G., including inserting into the cover letter a reference to their meeting with J.N. as a way of showing that DHS already had approved the use of Schedule A for the appointment. *Id.* at 27-28. The Special Counsel further claims that the respondent supervised the responses to OPM's questions regarding the appointment, instructing the staff on content and revising their work. *Id.* at 28-29. Those responses, according to the Special Counsel, did not notify OPM about the earlier unsuccessful attempt to hire Applicant A through a competitive appointment, as well as the decision not to seek other potential applicants because the CBP had determined that the position was intended only for Applicant A. *Id.* at 29.

¶48    We agree, however, with the ALJ's determination that the Special Counsel overstated the respondent's involvement in processing Applicant A's Schedule A application and that the respondent's role was limited to insubstantial actions not proscribed by statute or regulations set forth in the Special Counsel's complaint. ID at 48, 52, 57.[9] The record reflects, for example, for the staff who assembled

---

[9] The Special Counsel contends that a "ministerial" act leaves no room for choice or discretion, and that the respondent's certifications of the competitive applications did not meet this definition, presumably because she could choose whether or not she would sign them. PFR File, Tab 6 at 30 n.26. Regardless of how the term "ministerial" is interpreted, however, we agree with the ALJ's ultimate determination that the Special Counsel did not prove that the respondent acted with the requisite intent under the circumstances of this case.

Applicant A's Schedule A package, the respondent gave them a "coaching tip" that they should provide C.G. a hard copy of the attachments that they included in their email that transferred that package to her. IAF, Tab 84, Ex. 94 at 13. In addition, she edited the Schedule A cover letter to show that it was being sent from DHS to OPM, rather than from C.G. to the Commissioner. *Compare* IAF, Tab 84, Ex. 94 at 2, *with id.* at 15; HT, Vol. 5 at 91-92. The respondent also asked her assistants to print the document on letterhead for C.G., and that the staff review the memorandum for "format, grammar, etc." IAF, Tab 84, Ex. 94 at 25, 28; HT, Vol. 5 at 92-93, 95‑96. Similarly, the respondent testified that she instructed her staff to change the introductory paragraph of Applicant A's Schedule A letter in accordance with C.G.'s desire to indicate that using such authority for Applicant A already had been discussed with J.N., HT, Vol. 5 at 103-04, and to change a response to OPM's question regarding the conversion by clarifying that the CBP's HRM had consulted with DHS on using Schedule A for Applicant A, and removing a reference to the selecting official and functional managers having consulted with DHS to be more accurate and truthful, *id.* at 132‑34.

¶49 The Special Counsel contends that the CBP's response to OPM, which the respondent edited, did not notify OPM about the earlier unsuccessful attempt to hire Applicant A through a competitive appointment and the decision not to seek other potential applicants because the position was intended only for Applicant A. OPM's questions, though, focused on why the CBP used the Schedule A authority without following its operating procedures regarding contacting other recruitment sources. *E.g.*, IAF, Tab 84, Ex. 113 at 1-8, 11-13. The draft response candidly indicated to OPM that the CBP interpreted its operating procedures so as to permit C.G., the Assistant Commissioner of the CBP's HRM, to exempt the CBP from following its operating procedures and used "informal networking opportunities to identify a superior candidate that would meet the mission

specific requirements of this position." *Id.* at 3.  Therefore, we draw no adverse inference from the respondent or anyone else who reviewed and submitted the document to OPM in failing to include other information that OPM had not requested.  In fact, the respondent notified her staff that its earlier draft response was not sufficient and a more comprehensive explanation and response to the questions was required because OPM was "asking us the same question—we can't give them a shorter more cryptic response." *Id.* at 10.  We find that the Special Counsel has failed to prove by preponderant evidence that the respondent engaged in any of these acts related to the Schedule A authority with the intent to afford preferential treatment.

We defer to the administrative law judge's finding that J.N. was a credible witness, in support of his conclusion that the Special Counsel failed to prove that the respondent intentionally committed an unlawful hiring practice.

¶50    The Special Counsel asserts that the ALJ erred when he relied upon Chief Human Capital Officer J.N.'s "speculative" testimony.  PFR File, Tab 6 at 30.  The Special Counsel also contends that the ALJ erroneously required it to prove that the respondent was the "mastermind" behind the prohibited activity because 5 U.S.C. § 2302(b)(6) and Board precedent provide that any official with personnel authority who grants an unauthorized preference should be held liable.  PFR File, Tab 6 at 30.  The Special Counsel asserts that, although the ALJ implied that HRM Assistant Commissioner C.G. "set up" the respondent for blame by being absent on the days the appointments had to be certified (and thereby having the respondent, rather than C.G., certify and sign the packages), the respondent admitted that she acted voluntarily and on her own.  *Id.* at 31.  Further, the Special Counsel contends that the ALJ improperly relied on J.N.'s opinions about the respondent's role, rather than the facts, and that J.N. admitted on cross examination that his opinions as to the respondent's role were based on speculation and "things" he heard "from people," not on what he observed.  *Id.*  The Special Counsel asserts that, although the ALJ found that J.N. was credible

because he had no particular personal or professional stake in the outcome of the personnel actions at issue, J.N. knew that the Schedule A action was being driven by the Commissioner's desire to hire Applicant A and J.N. retired before the Special Counsel's investigative interviews began. *Id.* at 32.

¶51    We agree with the Special Counsel that an individual need not be a "mastermind" of the prohibited activity to violate 5 U.S.C. § 2302(b)(6). Nevertheless, as set forth above, the ALJ correctly required the Special Counsel to prove that the respondent intended to grant an authorized preference when she certified the competitive application packages of the three applicants at issue and engaged in other acts related to Applicant A's Schedule A application.    ID at 24-25; *see, e.g.*, *Byrd*, 59 M.S.P.R. at 590.  The ALJ did not require the Special Counsel to prove that the respondent was the "mastermind" of the prohibited activity, but merely included in his analysis testimony from J.N. that *he* did not see a lot of evidence that the respondent was the "mastermind of this thing."  ID at 46.  Despite the Special Counsel's contention that the respondent admitted during testimony that she acted voluntarily and on her own in certifying the competitive applications, this testimony merely reflects the respondent's belief that no one pressured her or told her to sign the certifications, she was accountable and responsible for certifying the packages, and she should have reviewed them more carefully than she did.  IAF, Tab 86, Ex. 133 at 86, 122, 132; HT, Vol. 7 at 56.   Such testimony does not demonstrate that the respondent intended to grant an unauthorized preference or advantage, and is consistent with the ALJ's findings regarding C.G.'s apparently suspicious role in the matter.

¶52    Further, the ALJ assigned particular credibility to J.N.'s testimony concerning C.G., noting J.N.'s demeanor during his testimony, his position as the senior HR officer at DHS, and his "unique personal and professional perspective from which he could judge the actions and motivations of the actors, specifically including [C.G.]."   ID at 53.   Despite the Special Counsel's claim that J.N. admitted on cross examination that his opinions as to the respondent's role were

based on speculation and rumors, J.N. also testified that his opinions regarding C.G. were based on his work with her on the Human Capital Council, which usually met once per month to address human capital issues. HT, Vol. 4 at 278. He further testified that his opinion as to C.G.'s and the respondent's respective roles in the matters at issue was based as well on information he received from his staff, who would give him their impressions "of the various components and who actually would work with the Department on things, who tried to be as independent as possible, who really they viewed as trustworthy, who they didn't." *Id.* at 279-80. J.N. testified that he formed his own opinions based on that information and his personal exposure to the individuals in question. *Id.* at 280. As set forth above, J.N. also directly observed C.G. and the respondent during his meeting with them at which he rejected the CBP's request to appoint the three applicants at issue pursuant to the competitive application process. Accordingly, we find no basis to discount the ALJ's findings in this regard.

¶53   Likewise, the ALJ's finding that J.N. was credible because he had no particular personal or professional stake in the outcome of the personnel actions at issue was only one of the bases upon which he found J.N.'s testimony to be credible. ID at 53. In any event, J.N.'s knowledge that the Commissioner wanted to hire Applicant A, and the timing of J.N.'s retirement, HT, Vol. 4 at 156-57, 267, do not show that J.N. had a stake in the outcome of this matter or that the ALJ should have found J.N. not credible.

¶54   The Special Counsel's arguments in this case are primarily based upon circumstantial evidence. Proper circumstantial evidence can be relied upon to establish intent. *Acting Special Counsel v. Sullivan*, 6 M.S.P.R. 526, 546 (1981). The Board may infer intent when the strength of the evidence warrants such an inference. *Id.* However, conclusions as to subjective intent may not be based on mere surmise or speculation as to what plausibly could have occurred, and an unlawful intent "is not lightly to be inferred." *Id.*

¶55    We find that the circumstantial and any other evidence relied upon by the Special Counsel is not sufficiently strong to warrant an inference that the respondent intended to grant a preference or advantage not authorized by law, rule, or regulation when she took any of the actions at issue in this case. Most of the evidence identified by the Special Counsel addresses whether and when the respondent knew, in general terms, that certain individuals within the CBP were interested in hiring the three applicants at issue. By contrast, as the ALJ found, ID at 29-31, 34-35, 43-44, there is little, if any, evidence in the record to show the respondent was aware of any improper actions taken by the IHC in preparing the application packages that she ultimately certified, or knowledge on her part that using the Schedule A authority to hire Applicant A was inappropriate.

¶56    While the Board is free to substitute its judgment for that of an ALJ, the Board is not free to overturn an ALJ's credibility findings merely because it disagrees with those findings. *See Haebe v. Department of Justice*, 288 F.3d 1288, 1299 (Fed. Cir. 2002). The Board must defer to an ALJ's credibility determinations when they are based, explicitly or implicitly, on observing the demeanor of witnesses testifying at a hearing. *Id.* at 1301. The Board may overturn such determinations only when it has "sufficiently sound" reasons for doing so. *Id.* Because the ALJ heard live testimony in this case, his credibility determinations must be deemed to be at least implicitly based upon the demeanor of the witnesses. *See Aldridge v. Department of Agriculture*, 111 M.S.P.R. 670, ¶ 11 (2009). In addition, he explicitly relied upon J.N.'s demeanor. ID at 53. Further, the ALJ specifically stated that he had thoroughly and carefully analyzed the documentary evidence, the testimony and credibility of witnesses, and the administrative record as a whole and found the respondent "highly credible." ID at 6, 41. We find that the Special Counsel's arguments on review do not constitute sufficiently sound reasons to overturn the ALJ's credibility determinations. In fact, when we consider the totality of the evidence, we find that the facts in this case are more consistent with the respondent having acted

with an innocent intent than they are with her not having done so. *See Beatrez v. Merit Systems Protection Board*, 413 F. App'x 298, 304, 306 (Fed. Cir. 2011).[10]

¶57    Accordingly, we deny the Special Counsel's petition for review, affirm the initial decision, and find that no disciplinary action is warranted in this case.

## ORDER

¶58    This is the final decision of the Merit Systems Protection Board in this appeal.  Title 5 of the Code of Federal Regulations, section 1201.113(c) (5 C.F.R. § 1201.113(c)).

## NOTICE TO THE RESPONDENT REGARDING YOUR FURTHER REVIEW RIGHTS

You have the right to request review of this final decision by the U.S. Court of Appeals for the Federal Circuit.  You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

The court must receive your request for review no later than 60 calendar days after the date of this order.  *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012).  If you choose to file, be very careful to file on time.  The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the Federal law that gives you this right.  It is found in

---

[10] The Board may rely on unpublished decisions of the U.S. Court of Appeals for the Federal Circuit if it finds the court's reasoning persuasive, as we do here.  *See Mauldin v. U.S. Postal Service*, 115 M.S.P.R. 513, ¶ 12 (2011).

Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.


FOR THE BOARD:


_____
Jennifer Everling
Acting Clerk of the Board
Washington, D.C.